424 A.2d 929
**David SPATZ, Si Richard Wynn, Howard R. Slater, and Donald A. Kahan, d/b/a Orchard Park Associates, a joint venture, Appellants,**

v.

**Frank J. NASCONE and Frank J. Zappala, Jr.**

Superior Court of Pennsylvania.

Argued Nov. 15, 1979.

Filed Jan. 16, 1981.

518

Michael K. Wolf, Chicago, Ill., for appellants.

Walter T. McGough, Pittsburgh, for appellees.

Before SPAETH, HOFFMAN and VAN der VOORT, JJ.

SPAETH, Judge:

This is an appeal from an order dismissing appellants' action in assumpsit and rescinding the agreement of sale between appellants and appellees. The case was tried before a judge sitting without a jury.

Appellants are a group of investors from Chicago, Illinois, who own property in Orchard Park, New York, as a joint venture called Orchard Park Associates. Appellees are Frank Zappala, an attorney, and Frank Nascone, a real estate developer. Appellees used to own the Orchard Park property. On September 2, 1966, they agreed to sell it to one Jack Jacobs, who was acting as broker on behalf of one of appellants, David Spatz. Spatz later assigned the agreement of sale to Orchard Park Associates.

Both appellants and appellees had extensive experience with real estate. Spatz testified that he had been making real estate investments since 1956. N.T. at 120. Zappala testified that he and Nascone became involved in real estate development in 1960 or 1961 when they formed the Maret Corporation. N.T. at 163. The business of Maret was to acquire land, negotiate leases of buildings to be built on the land, and arrange for the construction and financing of the buildings. N.T. at 163–164. Between 1960 and 1966, appellees either individually or as Maret developed six to eight sites with S.S. Kresge Company as the major tenant. N.T. at 168. In 1966 alone appellees acquired and sold at least four parcels of land on which S.S. Kresge stores, or K-Marts, were to be built.

One of these four parcels was the Orchard Park property. Before selling Spatz the Orchard Park property, appellees had sold two other of the four parcels to Spatz.[1] On January 3, 1966, Spatz purchased the K-Mart parcel in Altoona, Pennsylvania, for $1,550,062.50, payable by taking the property subject to a first mortgage in the amount of $1,300,000.00, and $250,062.50 in cash. Plaintiff's Exhibit 1. The cash figure was arrived at by capitalizing the projected annual net cash flow at 8.5%. In making this calculation, Maret estimated that the property would be assessed $20,000 per year in real estate taxes, and it agreed that if the taxes actually assessed in the first full year following completion and acceptance of the shopping plaza by Kresge exceeded $20,000, it would pay the difference between the actual assessment and $20,000, capitalized at 8.5%. On May 14, 1966, Spatz purchased the K-Mart parcel in Canton, Ohio, for $1,415,000, payable by taking the property subject to a first mortgage in the amount of $1,200,000, and $215,000 in cash. This agreement provided that if the real estate taxes

1. The fourth parcel was in Cheektowaga, Erie County, New York. On March 14, 1966, Maret entered into an agreement of sale with Maurice and H. H. Shapera. The agreement included a provision for real estate tax reimbursement similar to the one disputed in this litigation. The Sharperas filed suit against Maret to collect money owing under this provision. The litigation was settled before it went to trial.

assessed against the property in the first full year following completion and acceptance by Kresge exceeded $15,000, Maret would pay the difference between the actual assessment and $15,000, capitalized at 9.5%. Plaintiff's Exhibit 3.

In April 1966, Jacobs, who also acted on Spatz's behalf in the Altoona and Canton transactions, began negotiating with Zappala and Nascone with respect to the Orchard Park property. On April 28, Zappala prepared an estimate of the revenues and expenses that might be expected from the Orchard Park K-Mart. Plaintiff's Exhibit 19. The figure for "Gross Rent" was $162,000, while that for "Real Estate Taxes" was $20,000. Zappala testified that he arrived at the latter figure by talking to a local attorney and banker, N.T. 181, who did not break down their figures as to the respective taxes covered, N.T. at 192.

On May 23, 1966, Zappala and Nascone entered into a lease with Kresge for an unbuilt K-Mart. Plaintiff's Exhibit 17A. Kresge was to pay 1% of gross sales exceeding $6,046,500; at least $162,000 annually in gross rent; and for water, gas, and electricity furnished to the K-Mart, provided that Zappala and Nascone installed separate meters. Para. 16. Zappala and Nascone were to pay sewer charges on the property unless the charges were predicated on water consumption, in which case Kresge was to pay them. Para. 16. Finally, if Kresge decided to expand the K-Mart, it was required to reimburse Zappala and Nascone for any additional "real estate taxes" imposed on the property. Para. 15.

On July 20, Jacobs wrote Zappala that Zappala's April 28 estimate that the real estate taxes on the property would be $20,000 was too low and that the taxes might well be $30,000 a year. Such a tax expense would reduce the annual net cash flow to about $11,000, or a 5% return on the $200,000 Spatz expected to put up in cash. N.T. at 47. Anything less than a return of 10.4%, or roughly $21,000 on a $200,000 cash investment, was unacceptable to Spatz. N.T. at 48. Jacobs suggested to Zappala that he guarantee the taxes for the first full year as had been done in the Altoona and Canton agreements. Plaintiff's Exhibit 22. Upon receiving Jacob's

letter, Zappala assured him that he "would protect us on taxes. We can rest assured that we had nothing to fear of any tax discrepancies." N.T. at 55. In the negotiations that followed, the parties worked out and agreed upon a tax guarantee provision similar to those found in the Altoona and Canton agreements. The parties did not, however, discuss which government charges would be considered taxes for the purpose of this guarantee. N.T. 63.

On September 2, Jacobs, acting as a nominee of Spatz, and Zappala and Nascone entered into an agreement of sale for the eventual transfer of the Orchard Park Property. Under the terms of the agreement, the sellers would supervise the construction of a K-Mart store in conformance with their lease obligation to K-Mart, and transfer the property to Jacobs after the completion of the store. The purchase price was $1,525,000, $1,325,000 of which was payable by taking title subject to a first mortgage in that amount, and the balance of $200,000 in cash. The agreement contained a provision designed to protect Jacobs against real estate taxes in excess of $20,000 per year, which read: [2]

7. *Purchase Price Adjustment—Real Estate Taxes.*

The Seller agrees that in the event the real estate taxes assessed against the K-Mart Parcel in the first full year following the date of completion of the Shopping Plaza and acceptance thereof by the S.S. Kresge Company, and its full assessment as a completed project and in the next succeeding three (3) years exceeds TWENTY

---

2. In the lower court's opinion, quoting the agreement, the words "by" and "to" in the last sentence of the provision are reversed, so that the last clause is quoted as reading:

the difference between such fourth tax bill and the estimated figure of TWENTY THOUSAND DOLLARS ($20,000.00) capitalized at 10.4% shall be repaid to Seller by Purchaser when such tax is due. Slip op. at 2.

This was an inadvertent mistake in one of the copies of the agreement. Zappala testified that this copy of the agreement was wrong; the parties had agreed that the seller would reimburse the purchaser for the excess taxes and not the other way around. N.T. at 185–186. Appellant Kahan testified that he brought the error in this copy of the agreement to Richard Zappala's attention and he had agreed that "by" and "to" should be switched. N.T. 104. Kahan made the change on his copy of the agreement, which was Plaintiff's Exhibit 16.

THOUSAND DOLLARS ($20,000.00) per annum, Seller shall repay to Purchaser, the difference between each of such tax bills as annually assessed and the estimated figure of TWENTY THOUSAND DOLLARS ($20,-000.00) when the tax for each of those years is due. In addition, after receipt of the fourth of the tax bills (the bill for the fourth of the years described hereinbefore), the difference between such fourth tax bill and the estimated figure of TWENTY THOUSAND DOLLARS ($20,000.00) capitalized at 10.4% shall be repaid by Seller to Purchaser when such tax is due.

Plaintiff's Exhibit 16.

The agreement contained no definition of what the term "Real Estate Taxes" meant.

After the Orchard Park agreement was executed, Zappala and Nascone consummated their purchase of the land described, procured the mortgage for and supervised the construction of the K-Mart store, and amended the lease with Kresge. On November 16, 1967, the K-Mart was completed and on January 22, 1968, Orchard Park Associates, which had in the meantime been assigned the agreement of sale, closed on the property. At the closing, Nascone and Zappala assigned to Orchard Park Associates the Kresge lease and an amendment increasing the minimum annual rental to $165,-000.[3]

Orchard Park Associates' tax liability for the land began in 1968, which was the first full year after the completion and acceptance of the shopping plaza. In October 1967, Spatz paid the school tax bill for 1967–68 in an amount of $5,081.72. In January 1968, Spatz paid the state, county, and town tax bill for 1968 in the amount of $8,088.30. The bill listed the following items:

LIGHT DISTRICT NO 6
WATER DIST NO 15
SEWER 18C 1967

3. The consideration for this amendment was Zappala's and Nascone's agreement to receive 1% of gross sales over $6,618,300, instead of $6,046,500, the figure in the original lease.

ERIE CO SEW DST 3
FIRE PROTECTION
GENERAL TOWN TAX
TOWN HIGHWAY ITEM 1
TOWN HIGHWAY ITEM 2 3 4
WELFARE AND RELIEF TAX
STATE AND COUNTY TAX
TAX EQUALIZATION PAYMENT ORDERED BY STATE

In September 1968, Spatz received and paid a school tax bill for 1968–69 in the amount of $13,548.70. The total 1968 taxes adjusted for the school tax[4] were $17,403.51.

On July 26, 1968, Zappala wrote to the assessor of the town of Orchard Park. The occasion for the letter was that Zappala had learned that the town had raised the assessment on the Orchard Park property from $100,000 to $331,-250. Zappala stated that the new assessment would raise "real estate taxes" to approximately $35,000, which would reduce Orchard Park Associates' return on their investment to less than 7%. Plaintiff's Exhibit 39. The town of Orchard Park subsequently reduced the new assessment to $250,000. Plaintiff's Exhibit 40.

On February 6, 1969, Spatz paid the 1969 state, county, and town tax bill for $21,063.76. Plaintiff's Exhibit 18G. This bill listed the same items as had the 1968 bill. Knowing that the $20,000 base figure would thus be exceeded, Zappala attempted to negotiate a rental increase with Kresge. Plaintiff's Exhibit 44. Initially, Kresge was reluctant to agree to any increase, or to pay any of the items on the tax

---

**4.** The school taxes were adjusted as follows:

| | | |
|---|---|---|
| 1967–1968 School Tax | — | $ 5,081.72 |
| 1968–1969 School Tax | — | 13,548.70 |
| | | $18,630.42 |

$$\frac{\$18,630.42}{2} = \$9,315.21$$

Adjusted 1968 School Tax = $ 9,315.21

Appellees agreed to this method of adjustment of the taxes. On September 20, 1976, before this case went to trial, they wrote to the lower court that in calculating the annual school tax, the court could use either the school tax bill for the fiscal year beginning in a given year, or one half the bill for the fiscal year ending in that year plus one-half the bill for the fiscal year beginning that year. Slip op. at 3. Taking $9,315.21 as the adjusted school tax for 1968, and $8,088.30 as the state, county, and town tax for 1968, *see* text, the total for 1968 was $17,403.51.

bill relating to sewer and water, since it considered that it was not obliged to pay these items under its lease because they were not submitted to it as utility bills but rather to Orchard Park Associates as a part of the tax bill. N.T. 186–187. Zappala, however, persisted, and, after Spatz informed him in September that the total adjusted taxes for 1969 would be $36,155.96 (the school tax for 1969–1970 was $16,635.71),[5] or $16,155.96 over the $20,000 base figure, Kresge agreed to a $10,000 increase in the rent and the lease was amended accordingly. Plaintiff's Exhibit 17C. On November 25, Spatz wrote to Zappala requesting that he send him a check for $13,655.97, which represented $16,155.96, the 1969 excess figure, minus a $2,499.99 credit for the rental increase that Zappala had procured. Plaintiff's Exhibit 52. Zappala did not answer this letter.

On January 15, 1970, Spatz forwarded to Zappala the 1970 state, county, and town tax bill for $24,072.14 and again requested that Zappala pay Orchard Park Associates the excess owed on the 1969 taxes. Plaintiff's Exhibit 55. Zappala did not answer this letter nor others that followed. Plaintiff's Exhibits 56, 57. On September 16, Spatz forwarded to Zappala the school tax bill for 1970–71, $20,723.86. He calculated that Zappala and Nascone owed Orchard Park Associates $12,750.92 for 1970 taxes,[6] and requested that Zappala pay Orchard Park Associates a total of $26,406.89 for the 1969 and 1970 taxes. Plaintiff's Exhibit 61. Zappala acknowledged the "bad news" about the 1970 taxes, but did not remit any money to Spatz. Plaintiff's Exhibit 62.

On January 15, 1971, Spatz forwarded to Zappala the state, county, and town tax bill for 1971, which was due February 15 and totaled $34,252.86. Plaintiff's Exhibits, 63, 18K. On January 18, Zappala wrote to an official in the

5. This figure reflects the same adjustment for the school tax that was explained in note 4, *supra.*

6. This figure reflects the total taxes for 1970 (including adjusted school tax as explained in note 4, *supra*) in excess of $30,000 ($20,000 base plus $10,000 credit for the rental increase).

Kresge Real Estate Department requesting a meeting with company executives to discuss the problems created by the unanticipated tax increases. In this letter Zappala stated:

The present operating position of the property is as follows:

| | |
|---|---|
| Gross Rent | $175,000.00 |
| Mortgage Payment | 108,630.00 |
| Real Estate Taxes | 54,976.72 [7] |
| Net Income | $ 11,373.28 |

From this simplified operating breaktown [sic] it is apparent that the sum of $11,373.28 is grossly inadequate to cover basic landlord responsibilities such as insurance, parking lot cleaning, maintenance, outside lighting, and snow removal. Obviously, there is no possibility of any return whatsoever to the investor on his equity.

The situation is very serious. The Town bill in the amount of $34,252.86 is due February 15, 1971. With the operating and maintenance expenses incurred to date their [sic] simply is not enough money to pay this tax bill.

Plaintiff's Exhibit 64.

On February 24, Zappala wrote Kresge again, this time offering to sell the property to Kresge for $1,450,000. In this letter Zappala stated:

In our prior correspondence of February 19, 1969, September 22, 1969, and most recently on January 18, 1971, we have advised as to the seriousness of the problem that the current owner, David Spatz, is faced with as a result of the fantastic real estate tax increase on the above-captioned property. Because of the seriousness of the problem as it faces Mr. Spatz, Mr. Nascone and myself are much concerned because of the provisions of Article 7 to the Purchase Agreement .... The net effect of that provision of the Agreement requires that Mr. Nascone and myself become obligated to pay out to Mr. Spatz the sum

7. This figure was based on the state, county, and town tax bill for 1971 ($34,252.86) and the school tax bill for 1970–1971 ($20,723.86).

of $259,750 in order to correct the problem. We would still be without title or benefit of any kind.

Under the present circumstances, as indicated in prior correspondence, there is not enough money to pay the current real estate taxes. In fact, the taxes due February 15, 1971 have not been paid.

Plaintiff's Exhibit 65.

Zappala later testified that:

The letter was written in order to attempt some solution at the request of Mr. Kahan and Mr. Spatz. It specifically presented to Kresge an offer to buy the property.

At Kresge's request, Mr. Johnson [an official of Kresge] specifically asked me to outline in the letter as a preamble to it, what we construed to be the worst circumstance so that it can be considered by them as something they might consider on behalf of Frank Nascone and Frank Zappala. N.T. at 267.

On May 11, Zappala's efforts having been to no avail, Kahan wrote to Nascone and Zappala advising them that he would take appropriate legal action if the problem were not resolved in seven days. It was not resolved, and appellants filed the lawsuit that is the subject of this appeal.

At trial, appellants' case centered on their claim that under paragraph 7 of their agreement with appellees guaranteeing that they would be paid the difference between the real estate taxes actually assessed and the estimated taxes of $20,000, they were entitled to recover $275,489.18. This figure was calculated by considering as "real estate taxes" within the agreement all of the items included on the tax bills. Appellees argued that of those items, only those items labeled "general town tax," "state and county tax," and "school tax" should be considered as within the agreement. Thus calculated, appellees' liability to appellants was $50,-527.99. The lower court favored appellees' interpretation of the agreement because the New York Real Property Tax

Law defined "tax" to exclude the arguably special charges that were included on the tax bills, such as "sewer", and that accounted for the difference between appellants' and appellees' calculations of appellees' liability.[8] The court believed that any other interpretation of the agreement would be unconscionable. The court further found mutual mistake and lack of mutual assent to the agreement, and on this basis, rescinded the agreement. The court did this *sua sponte*. Appellees had prayed for rescission but only in the event that the court should reject their interpretation of the agreement. Answer to Amended Complaint and New Matter, Para. 19–22. At no point did appellees pray for rescission if the court should accept their interpretation (as in fact the court did); in that event appellees acknowledged their liability under the agreement, calculating that liability, as has been noted, at $50,527.99.

8. Section 102(20) of the New York Real Property Tax Law states:
 'Tax' or 'taxation' means a charge imposed upon real property by or on behalf of a county, city, town, village or school district for municipal or school district purposes, but does not include a special ad valorem levy or a special assessment. The term 'tax' or 'taxes' as used in articles five, nine, ten and eleven of this chapter shall for levy and collection purposes include special ad valorem levies.
 Section 102(14) states:
 'Special ad valorem levy' means a charge imposed upon benefited real property in the same manner and at the same time as taxes for municipal purposes to defray the cost, including operation and maintenance, of a special district improvement or service, but not including any charge imposed by or on behalf of a city or village.
 Section 102(15) states:
 'Special assessment' means a charge imposed upon benefited real property in proportion to the benefit received by such property to defray the cost, including operation and maintenance, of a special district improvement or service or of a special improvement or service, but does not include a special ad valorem levy.
 Section 102(16) states:
 'Special district' means a town or county improvement district, district corporation or other district established for the purpose of carrying on, performing or financing one or more improvements or services intended to benefit the health, welfare, safety or convenience of the inhabitants of such district or to benefit the real property within such district, and in which real property is subject to special ad valorem levies or special assessments for the purposes for which such district was established.

—Should the Agreement have been Rescinded?—

Logically, this is not the first issue raised. We shall nevertheless consider it first, for its disposition requires almost no discussion.

■ It is plain to us that the lower court exceeded its authority in ordering the agreement rescinded. Appellees sought rescission only if the court should *reject* their construction of the phrase "real estate taxes" as used in the agreement. The court, however, did not reject but instead *accepted* appellees' construction of "real estate taxes." Both the pleadings and the testimony demonstrated that appellees acknowledged—indeed, asserted—that according to their construction of "real estate taxes," they were liable to appellants in the amount of $50,527.99. Accordingly, having accepted appellees' construction of "real estate taxes," the court had only to decide whether it also accepted appellees' calculation of their liability, and to find for appellants either in that amount or in such amount as the court believed correct. The court had no reason to do more, and *sua sponte* order the agreement rescinded, thereby granting appellees relief they had not requested, and relieving them of liability they had admitted.

In rescinding the agreement, the lower court stated: The evidence reveals that there was no communication among the parties regarding the definition of "real estate taxes." There was no discussion with respect to the charges in question, and, since the plaintiffs were extremely careful to negotiate this transaction so as to provide a return of 10.4 per cent, the mutual mistake in this case goes to an essential inducing fact of the agreement, and, if such is the case, and the parties can be restored to their former positions, rescission is the appropriate remedy. [Citation omitted] .... The power to rescind a contract is based upon the fact that the obligations thereunder are void, because the parties failed to reach an agreement at all, and under the law of contracts, the lack of a manifestation of mutual assent means that no contract was ever formed between the parties.

Slip op. at 10.

Section 293 of the Restatement (Second) of Contracts (Tent. Draft No. 10 1975) defines a mistake as a "belief that is not in accord with existing facts." Section 294 provides when a mutual mistake of the parties may be the basis of voiding a contract:

> (1) Where a mistake of both parties at the time a contract was made as to a basic assumption on which the contract was made has a material effect on the agreed exchange of performances, the contract is voidable by the adversely affected party unless he bears the risk of the mistake under the rule stated in § 296.

Comment (a) to the section states:

> Before making a contract, a party ordinarily evaluates the proposed exchange of performances on the basis of a variety of assumptions with respect to existing facts. Many of these assumptions are shared by the other party, in the sense that the other party is aware that they are made. The mere fact that both parties are mistaken with respect to such an assumption does not, of itself, afford a reason for avoidance of the contract by the adversely affected party. Relief is only appropriate in exceptional situations, where a mistake of both parties upsets the very basis for the contract in such a way as to have a material effect on the agreed exchange of performances.

Illustration 1 is:

> A contracts to sell and B to buy a tract of land, the value of which has depended mainly on the timber on it. Both A and B believe that the timber is still there, but in fact it has been destroyed by fire. The contract is voidable by B.

Illustration 2 is:

> A contracts to sell and B to buy a tract of land, on the basis of the report of a surveyor whom A had employed to determine the acreage. The price is, however, a lump sum not calculated from the acreage. Because of an error in computation by the surveyor, the tract contains ten per cent more acreage than he reports. The contract is voidable by A.

*And see Ehrenzeller v. Chubb,* 171 Pa.Super. 460, 90 A.2d 286 (1952).

█ Here, we are unable to conclude that in entering into the contract, the parties were operating under any mutual mistake, much less a mutual mistake that "upsets the very basis for the contract." The lower court did not identify what it considered the parties' mutual mistake to have been. It cannot be said that the parties believed that only certain taxes would be imposed on the property, but that in fact others were imposed; Zappala never expressed any surprise regarding any of the items on the tax bills forwarded to him by Spatz. Nor can it be said that the parties entered into the agreement believing that the tax millage rate and the assessed valuation of the property would remain constant, but that in fact it changed; the reason for the tax guarantee that the parties incorporated into their agreement was the parties' recognition that the tax millage rate and the assessed valuation might change, and that if either did, appellants should be reimbursed for any change occurring within a stated period.

The lower court's order rescinding the agreement must therefore be reversed. The question remains, however, what further relief should be ordered.

—How Should the Agreement be Interpreted?—

Appellants argue that all the items on the tax bills fit within the "common and ordinary" definition of "real estate taxes," and that even if this is not the case, appellees' course of dealing shows that they intended, and the parties understood, that as used in the agreement, "real estate taxes" included all the items on the tax bills.

In *Chuy v. Philadelphia Eagles Football Club,* 595 F.2d 1265, 1271 (3d Cir. 1979), the court stated the current Pennsylvania law on interpretation of a contract:

The cardinal rule of contract construction is that the intent of the parties at the time they contracted is controlling. *Kennedy v. Erkman,* 389 Pa. 651, 655, 133 A.2d 550, 552 (1957) .... [T]he intent of the contracting parties is

exclusively determined from the written instrument if its words are "clear and unambiguous." *Id.; see East Crossroads Center, Inc. v. Mellon-Stuart Co.*, 416 Pa. 229, 205 A.2d 865 (1965); *United Refining Co. v. Jenkins*, 410 Pa. 126, 189 A.2d 574 (1963). However, when the language of the written contract is ambiguous, extrinsic or parol evidence is admissible to resolve the ambiguity. *In re Herr's Estate*, 400 Pa. 90, 94, 161 A.2d 32, 34 (1960); *Kennedy v. Erkman, supra; Castellucci v. Columbia Gas, Inc.*, 226 Pa.Super. 288, 292, 310 A.2d 331, 333 (1973).

In addition to this statement of the law it may be noted that in interpreting contracts, Pennsylvania courts have often turned to the Restatement of Contracts for guidance. *See e. g., Rothstein v. Aetna Ins. Co.*, 216 Pa.Super. 418, 268 A.2d 233 (1970). The American Law Institute has promulgated tentative draft No. 5 of the Restatement (Second) of Contracts (Rev. ed. 1973), which sets out various guidelines for interpretating contracts. Sections 227, 228, and 229 form the core of the Restatement's treatment of interpretation. These sections are as follows:

§ 227. Whose Meaning Prevails

(1) Where the parties have attached the same meaning to a promise or agreement or a term thereof, it is interpreted in accordance with that meaning.

(2) Where the parties have attached different meanings to a promise or agreement or a term thereof, it is interpreted in accordance with the meaning attached by one of them if at the time the agreement was made

(a) that party did not know of any different meaning attached by the other, and the other knew the meaning attached by the first party; or

(b) that party had no reason to know of any different meaning attached by the other, and the other had reason to know the meaning attached by the first party.

(3) Except as stated in this section, neither party is bound by the meaning attached by the other, even though the result may be a failure of mutual assent.

§ 228. Rules in Aid of Interpretation

(1) Words and other conduct are interpreted in the light of all the circumstances, and if the principal purpose of the parties is ascertainable it is given great weight. (2) A writing is interpreted as a whole, and all writings that are part of the same transaction are interpreted together.

(3) Unless a different intention is manifested,

(a) where language has a generally prevailing meaning, it is interpreted in accordance with that meaning;

(b) technical terms and words of art are given their technical meaning when used in a transaction within their technical field.

(4) Where an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement. (5) Wherever reasonable, the manifestations of intention of the parties to a promise or agreement are interpreted as consistent with each other and with any relevant course of performance, course of dealing, or usage of trade.

§ 229. Standards of Preference in Interpretation

In the interpretation of a promise or agreement or a term thereof, the following standards of preference are generally applicable:

(a) an interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect;

(b) express terms are given greater weight than course of performance, course of dealing, and usage of trade, course of performance is given greater weight than course of dealing or usage of trade, and course of dealing is given greater weight than usage of trade;

(c) specific terms and exact terms are given greater weight than general language;

(d) separately negotiated or added terms are given greater weight than standardized terms or other terms not separately negotiated.

■ Initially, we are not persuaded by appellants that the phrase "real estate taxes" has a "common and ordinary" definition, or, as the Restatement (Second) puts it, a "generally prevailing meaning," which the parties must have intended when they used the phrase in their contract. It is true that "tax" does have a dictionary definition—a "pecuniary charge imposed by legislative or other public authority upon persons or property for public purposes," Webster's Third New International Dictionary 2345 (1968)—and that when applied in a real estate context, this might be said to represent a "generally prevailing meaning" of the phrase "real estate taxes." However, by its very terms, this meaning requires reference to specific statutes to determine what "pecuniary charges" the "legislative or other public authority" has "imposed."

We are also not persuaded by the lower court's approach to the meaning of "real estate taxes." The parties' agreement provided that it should be interpreted under Pennsylvania law. Noting that Pennsylvania does not have a statute defining "real estate taxes," the lower court, as has been mentioned, resorted to the definition in the New York Real Property Tax Law. The court justified this procedure by stating:

The plaintiffs have failed to establish any "common and ordinary meaning" which the parties attach to the term "real estate taxes," but if "real estate taxes" were to have any common and ordinary meaning in Pennsylvania, that meaning would include only municipality, county and school district taxes. Thus, the law which would apply to the definition of the term in question does not substantially differ between New York and Pennsylvania. The taxes in question, however, were levied by the sovereignty of the State of New York, and the statutory law of New York quite well defines a "tax" and a "special ad valorem levy," "special assessment" and "special district."

536

Slip op. at 7.

Thus the lower court adopted a particular technical, statutory definition of "real estate taxes", without, however, any evidence that the parties intended to do so.

The lower court cited no authority in support of its interpretation of the parties' agreement. Both the first Restatement and the tentative draft of the second Restatement caution against interpreting words in a particular technical sense when the parties may have intended to use them either in a nontechnical sense or in a context peculiar to the transaction itself. Comment (c) to Section 235 of the first Restatement states that "[m]ore frequently, however, than in the case of ordinary language technical terms may be misused, and if the context of a writing or other relevant circumstances show that a technical word was not used in its ordinary technical sense, another meaning may be given." Comment (f) to Section 228 of tentative draft No. 5 of the second Restatement adds that "[p]arties to an agreement often use the vocabulary of a particular place, vocation or trade, in which new words are coined and common words are assigned new meanings. But technical terms are often misused, and it may be shown that a technical word or phrase was used in a non-technical sense. Moreover, the same word may have a variety of technical and other meanings." Consistent with these admonitions, the courts of this state have been careful not to interpret technical words in a contract without an examination of the context in which they were used. In *Lehigh Coal Co. v. Wright*, 177 Pa. 387, 392, 35 A. 919 (1896), the Supreme Court stated:

> As preliminary to a construction of this contract we remark that the mere use of technical words or phrases . . . cannot be allowed to defeat the contrary intention of the parties, if the intention be manifest from the whole contract . . . .

*See also Berke v. Bregman*, 406 Pa. 142, 176 A.2d 644 (1962); *Lancaster Malleable Castings Co. v. Dunie*, 365 Pa. 95, 73 A.2d 417 (1950); *Glenn v. Strickland*, 21 Pa.Super. 88 (1902).

A helpful case from another jurisdiction is *Deerhurst Estates v. Meadow Homes Inc.*, 64 N.J.Super. 134, 165 A.2d 543 (App.Div.1960). There, the parties used in their contract a phrase that had a statutory definition; they agreed that the seller of a subdivision should get the "tentative approval" of the town planning board. The lower court ruled that as a matter of law, the phrase "tentative approval" was a reference to language in the Municipal Planning Act of 1953, and therefore refused to allow the seller to introduce parol evidence to demonstrate that by the use of the word "tentative" the parties had merely intended a synonym for "preliminary." The Appellate Division decided that the lower court had erred and remanded the case for further findings. The court stated:

> While it is true that the language, "tentative approval," appeared for the first time in the Municipal Planning Act of 1953, and thus took on a technical meaning previously unknown, examination of the history of the negotiations and the circumstances leading up to the execution of the contract at hand raises a reasonable doubt as to whether the technical meaning was intended by these parties. 64 N.J.Super. at 150, 165 A.2d at 552.

Furthermore, the court stated:

> It is true that parties in New Jersey are presumed to contract with reference to existing law. *Silverstein v. Keane*, 19 N.J. 1, 13, 115 A.2d 1 (1955). But reference to such law is generally effected in cases of contract "construction," *i. e.*, determination of the unexpressed implications of what is written, rather than in instances of "interpretation" of the written language. See 3 Corbin, Contracts, § 534, p. 6; 3 Williston, Contracts, § 602, p. 1728. The law of New Jersey is not a silent factor in every contract executed in this State in the sense that the statutory definitions, N.J.S.A. 1:1–2, govern the interpretation of every ambiguous phrase in a private agreement. With respect to the process of interpreting contractual language, statutes and common law principles are only

part of the surrounding circumstances, and should be so considered. 3 Corbin, Contracts, § 551, p. 108; 3 Williston, Contracts, § 615, p. 1767.

64 N.J.Super. at 150, 165 A.2d at 552–53.

Here, as in *Deerhurst Estates,* the parties used in their contract a phrase that has a statutory definition.[9] The issue, therefore, is whether the parties intended to use the phrase in this technical meaning.

In *Deerhurst Estates* the court resolved this issue by remanding for further findings, which here would mean granting a new trial. The most difficult question we have had to decide in the present case is whether to grant a new trial or order the entry of judgment n. o. v.

**9.** Appellees cite two cases that they claim compel us to interpret the parties' contract in accordance with the New York Statute. Both, however, are distinguishable.

In *Fischer & Porter Company v. Porter,* 364 Pa. 495, 72 A.2d 98 (1950), a corporation sued one of its former owners for tax refunds that he had received by reason of his overpayment of taxes. Under an agreement between the parties, the corporation was entitled to such refunds. The Court held that the lower court erred when it did not grant judgment to the corporation as a matter of law since the Internal Revenue Code defined "overpayment" to include the corporation's claim. The Court reasoned that since the contract as a whole required the application of the Internal Revenue Code, the parties must have intended that its definition of "overpayment" should govern. Moreover, the only evidence that the Internal Revenue Code definition did not apply was the former owner's self-serving testimony that he did not interpret the contract in that manner—testimony that the lower court should not have admitted into evidence. Here, not only does the contract not require the application of the New York statute's definition of "real estate taxes," but, as will be discussed, a great deal of evidence shows that the parties did not intend that definition.

In *Dolman v. United States Trust Co. of N. Y.,* 2 N.Y.2d 110, 157 N.Y.S.2d 537, 138 N.E.2d 784 (1956), a tenant sought to recover damages for a landlord's breach of a covenant of quiet enjoyment. The court had to determine whether the property had been "condemned," a term that had been used in the parties' lease. The court looked to statutory law defining "condemnation," reasoning that unless the contract provision defined the term differently, the law in force at the time of the agreement controlled. The court noted that there was no evidence in the case that the parties intended otherwise. Again, here, as will be discussed, a great deal of evidence shows that the parties intended otherwise.

As previously noted, Section 228 of tentative draft No. 5 of the Second Restatement places "great weight" on the "principal purpose of the parties" if this purpose is ascertainable. Here the parties began their negotiations with a clear notion of what they wanted to accomplish: appellees saw themselves as developers of the Orchard Park property, and appellants saw themselves as eventual owners of the property and landlords of the K-Mart store that would be built there. Both parties understood that for such a development to be accomplished, appellants would have to be assured of receiving a return on their $200,000 investment of no less than 10.4%. The principal purpose of the parties, thus, was to achieve such assurance. Similarly, in the prior transactions between the parties, the principal purpose had been to achieve assurance that appellants would receive a stated return on their investment.

At the outset of the negotiations, Zappala prepared a comprehensive estimate of expenses and revenues that was intended to demonstrate to Jacobs, and through him, Spatz, that appellants would receive a 10.4% return. Under the expenses section of the estimate were listed several items: Debt Service, Real Estate Taxes, Insurance, Maintenance and Lighting and Snow Removal. Plaintiff's Exhibits 19, 19A. Although it is undisputed that neither party discussed the meaning of the term "Real Estate taxes" as it appeared in Zappala's estimate, perhaps because the term had been used in prior agreements between the parties without dispute, it seems apparent from looking at the estimate that only "Real Estate taxes" and, perhaps, "Maintenance and Lighting," reflected possible government-imposed charges. Missing from the estimate was any mention of charges for public utilities, for example, water, gas, electricity, or sewer charges. This omission is not surprising, given that three weeks after the initial estimate, Zappala and Nascone entered into the lease with Kresge under the terms of which Kresge was obligated to pay for public utilities, as long as separate meters were installed in the K-Mart, and for sewer charges or sewer taxes, as long as they were predicated on

water consumption. Plaintiff's Exhibit 17A, Paragraph 16. Presumably, then, the figure for "Real Estate taxes" and "Maintenance and Lighting" in the estimate did not include the utilities that Kresge would be obligated to pay for under its lease, but did include those public utility items for which appellants would be charged as owners of the property and without regard to amount of use.

The fact that Zappala's estimate of "Real Estate taxes" was intended to include public utility items if they were billed directly to appellants as owners of the property is further suggested by Zappala's conduct after the agreement of sale was signed. In September 1968, Spatz paid a school tax bill for 1968–1969 in the amount of $13,548.70. In February 1969, he paid the state, county, and town tax bill for 1969 in the amount of $21,063.76. This bill, like the state, county, and town tax bill for 1968, contained the following items:

LIGHT DISTRICT NO 6
WATER DIST NO 15
SEWER 18C 1967
ERIE CO SEW DST 3
FIRE PROTECTION
GENERAL TOWN TAX
TOWN HIGHWAY ITEM 1
TOWN HIGHWAY ITEM 2 3 4
WELFARE AND RELIEF TAX
STATE AND COUNTY TAX
TAX EQUALIZATION PAYMENT ORDERED BY STATE

Shortly after Spatz paid the 1969 bill, and in response to his concerns about it, Zappala wrote to Kresge requesting that it agree to a $10,000 increase in the gross annual rent that it paid for the Orchard Park store.[10] In his letter, Zappala stated that the "*tax bill* was a total of $32,000 instead of the

10. At one point, Zappala requested that Kresge pay certain of the items on the tax bill relating to sewer and water. N.T. 186. Kresge refused, because while it acknowledged that it was obligated to pay for utilities under the lease, these items were not rendered as part of a utility bill, but of a tax bill. N.T. 187. Zappala's refusal to pursue his request for payment of the sewer and water items, after Kresge's refusal, is consistent with the evidence that he agreed with Kresge's view of their obligation under the lease.

$20–22,000 range anticipated." Plaintiff's Exhibit 44. (Emphasis added.)

In September 1969, when Spatz received the 1969–1970 school tax bill and was able to calculate the total tax bill for 1969, Zappala once again wrote Kresge requesting that it agree to an increase in the annual rent. In his letter of September 22, Zappala wrote:

In our letter of February 19, 1969 we indicated that the anticipated tax bill had been in the $20–22,000 range, but that the actual billing would be approximately $32,000. The bill as finally received is $36,155.96, an increase of $14,155.96 over our highest previous estimate.

Plaintiff's Exhibit 50.

Kresge agreed to a $10,000 increase in the rent shortly thereafter. Plaintiff's Exhibit 52.

In 1971, Zappala once again wrote to Kresge on his own and appellants' behalf. By this time, it was clear that even the $10,000 increase in the annual rent was not going to compensate appellants for their escalating tax expense. On January 15, 1971, Spatz forwarded to Zappala the state, county, and town tax bill for 1971, which was due February 15 and totaled $34,252.86. Plaintiff's Exhibits 63, 18K. Spatz had previously forwarded to Zappala the 1970–1971 school tax bill, which totaled $20,723.86. On January 18, Zappala wrote to Kresge requesting a meeting with company executives to discuss the problems created by the unanticipated tax increases. Zappala once again listed the total of the state, county, and town tax bill and school tax bill as the "Real Estate Taxes" on the property. Plaintiff's Exhibit 64. He also stated that the situation is "very serious," with the "Town bill in the amount of $34,252.86 . . . due February 15, 1971." Plaintiff's Exhibit 64. Receiving no affirmative response, Zappala again wrote Kresge, this time stating:

In our prior correspondence of February 19, 1969, September 22, 1969, and most recently on January 18, 1971, we have advised as to the seriousness of the problem that the

current owner David Spatz, is faced with as a result of the fantastic real estate tax increase on the above-captioned property. Because of the seriousness of the problem as it faces Mr. Spatz, Mr. Nascone and myself are much concerned because of the provisions of Article 7 to the Purchase Agreement . . . The net effect of that provision of the Agreement requires that Mr. Nascone and myself become obligated to pay out to Mr. Spatz the sum of $259,750 [11] in order to correct the problem. We would still be without title or benefit of any kind.

Under the present circumstances, as indicated in prior correspondence, there is not enough money to pay the current real estate taxes. In fact, the taxes due February 15, 1971 have not been paid.

Plaintiff's Exhibit 65.

Zappala devoted the remainder of the letter to an offer to sell the property to Kresge, which he and Spatz had apparently agreed upon. Kresge did not accept the offer, and the relationship between appellants and appellees subsequently deteriorated.

It will have been noted that virtually all of the evidence referred to in the foregoing narration was documentary evidence, and that this evidence powerfully supports appellants' argument that from the outset the parties intended that the phrase "real estate taxes" should include public utility items if they were billed directly to appellants as owners of the property.[12] Indeed, it is difficult to read

11. It should be noted that Zappala's figure of $259,750 is less than the $275,489.18 that appellants now seek to recover. The discrepancy between the two figures may be explained (1) by the fact that appellants have calculated the school tax differently than perhaps Zappala did when he sent the letter, see lower court's Slip op. at 3, and (2) appellants' calculation includes consideration of the 1971–1972 school tax bill, which could not have been part of Zappala's calculation since it was sent to appellants well after Zappala's letter to Kresge.

12. It nevertheless appears that the lower court failed to consider this evidence, for it made no findings of fact with respect to it, nor discussed it.

Zappala's last letter to Kresge as anything other than an unequivocal admission of liability on that basis.

Zappala testified that his last letter to Kresge was written at the behest of Spatz and Kahan and presented the "worst circumstance" so that Kresge would be sympathetic to his offer to sell the property. N.T. at 267. From all that appears, however, the "fantastic real estate tax increase" described by Zappala *was* the "worst circumstance." Furthermore, Zappala's admission of his and Nascone's liability for $259,750 was consistent in every respect—in fact, derived from and followed—his prior letters to Kresge, which contained similarly damaging admissions. When these prior letters were offered, Zappala's counsel agreed to their admission without objection, N.T. 221, and in his testimony, Zappala offered no explanation at all for them, N.T. 259–260.

■ Zappala's only defense, so far as we can tell, was that he understood the phrase "real estate taxes" to include only "bills that we had been exposed to historically which were county tax bills, municipality tax bills, and the school tax bills," N.T. 216; by "real estate taxes," he said, he did not "contemplate sewer bills, water bills, and a lot of extrinsic items." N.T. 215. Appellant's objection to this testimony should have been sustained. Section 230 of the first Restatement states specifically that oral statements by parties of what they intended written language to mean should be excluded. This is so because the intention of a party relevant to the formation of a contract is the intention manifested by him rather than any undisclosed intention. Restatement of Contracts (Second) § 226 (Tent. Draft No. 5, Rev. ed. 1973). Thus, it was the documentary evidence of Zappala's words and conduct before, during, and after the transaction that was relevant, not his testimony of what his undisclosed intention was at the time he wrote those words and engaged in that conduct. *See Markides v. Soffer*, 172 Pa.Super. 215, 93 A.2d 99 (1952); *Koplin v. Franklin Fire Insurance Company*, 160 Pa.Super. 182, 50 A.2d 746 (1947).

 Despite the weakness of appellees' defense, we have nevertheless concluded out of an abundance of caution that we should grant a new trial rather than order entry of judgment n. o. v. in favor of appellants in the amount that the documentary evidence suggests appellees have admitted owing. Normally, as an appellate court we do not make findings of fact on our own, but review those of the lower court to determine whether they are adequately supported by the record. *See Bogosian v. Foerderer Tract Com., Inc.*, 264 Pa.Super. 83, 399 A.2d 408 (1979); *Chatham Communication v. General Press*, 463 Pa. 292, 344 A.2d 837 (1975); *Lanning Will*, 414 Pa. 313, 200 A.2d 392 (1964). Where a lower court has failed to make findings of fact with respect to a part of the record or has made findings of fact that do not support its conclusions, the appellate courts of this state have often remanded for further proceedings, *see e. g., B. & I. Co. v. Johnston & Harder, Inc.*, 340 Pa. 253, 16 A.2d 444 (1940); *Smith v. Peacock Construction Co.*, 214 Pa.Super. 324, 257 A.2d 592 (1969), although in some instances, the appellate courts have made findings on their own, *see e. g., Thompson v. Equit. L. Assurance Soc. of U.S.*, 447 Pa. 271, 290 A.2d 422 (1972); *Innes v. Nanticoke City Sch. Dist.*, 342 Pa. 433, 20 A.2d 225 (1941). Here, as mentioned above [13] the lower court did fail to make findings of fact with respect to a great deal of the evidence. When a lower court fails to make findings of fact with respect to testimonial evidence, we are most reluctant to make findings on our own, for determining the credibility of witnesses is clearly a function of the court that heard those witnesses. *See Commonwealth ex rel. Alexander v. Alexander*, 445 Pa. 406, 289 A.2d 83 (1971); *Lawner v. Engelbach*, 433 Pa. 311, 249 A.2d 295 (1969). Here, given the almost exclusively documentary character of the evidence, we do not see any issue of credibility. Nevertheless, one may be lurking somewhere in the case.

The order of the lower court is reversed and a new trial is granted.

13. *See* footnote 12, *supra*.