462 A.2d 686

**MERION SPRING COMPANY T/A Green Spring Company,**

v.

**MUELLES HNOS. GARCIA TORRES, S.A., Appellant.**

**MERION SPRING COMPANY T/A Green Spring Co., Appellant**

v.

**MUELLES HNOS. GARCIA TORRES, S.A.**

Superior Court of Pennsylvania.

Argued May 5, 1982.

Filed May 27, 1983.

Reargument Denied Aug. 4, 1983.

Petition for Allowance of Appeal Granted Dec. 15, 1983.

470

Richard Friedman, Philadelphia, for appellant (at No. 1343) and for appellee (at No. 1418).

Gilbert E. Toll, Philadelphia, for appellant (at No. 1418) and for appellee (at No. 1343).

Before SPAETH, ROWLEY and CIRILLO, JJ.

ROWLEY, Judge:

These are cross-appeals from a judgment entered pursuant to an order of the court *en banc*. The court rendered a partial "Judgment N.O.V." in favor of the appellant in No. 1418, but otherwise affirmed the general decision entered by the trial judge who sat without a jury.

Merion Spring Company (hereafter "Merion" or "plaintiff"), appellant in No. 1418, commenced this action on February 14, 1974, by filing a complaint in assumpsit. Merion sought damages in the amount of $32,515.75 for breach of a contract for the sale of twenty-five automobile spring manufacturing machines. In April 1976, the defendant, appellant in No. 1343, Muelles Hnos. Garcia Torres, S.A. (hereafter "Muelles" or "defendant"),[1] a corporation formed and located in the Republic of Mexico, filed an answer averring that it had not breached the contract. Furthermore, by way of counterclaim, Muelles averred that Merion had breached the contract and prayed that judgment be entered in its favor in an amount in excess of $500,-000.00, in large part representing a claim for lost profits. In December, 1978, the case was tried before the Honorable Calvin T. Wilson, sitting without a jury. Following two

---

1. Merion also brought suit against another Mexican firm, Suspensiones Y Parties Automotrices, S.A., which was found not to have been a party to the transaction or the contract. Merion does not attempt to disturb this finding.

days of testimony, the trial judge returned a general decision in favor of Muelles on both the complaint and the counterclaim, assessing against plaintiff Merion the following damages:

| | | |
|---|---|---|
| Money Paid | | $ 20,000.00 |
| Interest since breach | | Estimated |
| Maintaining Nonproductive Plant | | 2,300.00 |
| Operating Loss | | 12,000.00 |
| Loss [sic] Profits | | 200,000.00 |
| | Total | $234,000.00 |

Muelles filed no exceptions to the trial judge's decision. However, Merion filed timely exceptions and was granted leave to file further exceptions within ten days of the completion and filing of the transcript of testimony. After the additional exceptions were filed, all were briefed and argued before a three-judge court *en banc* which included the trial judge. The court *en banc* entered what it styled as a "Judgment N.O.V." in favor of Merion with respect to the damages awarded for lost profits on the ground that such losses had not been proven with sufficient certainty to permit their inclusion in the decision returned against Merion. The court said:

> The lost profits which are alleged by defendants [Muelles] are remote, are speculative and were not proved at trial to a degree of certainty that would warrant the grant of those damages. The court finds that defendant's business was unestablished and inoperable for spring manufacturing purposes prior to the time of the making of the contract. (Op.Ct. *En Banc*, p. 7)

Merion's remaining exceptions were dismissed and the court ordered that judgment be entered in favor of Muelles in the reduced amount of $34,000.00.

Muelles filed an appeal challenging 1) the propriety of the "Judgment N.O.V.," 2) the court's failure to award a specific amount for the interest element of the damages assessed and 3) mistakes or errors in the transcript of testimony. Merion also filed an appeal claiming that the trial court's conclusion that it had breached the contract was against the

weight of the evidence and that the damages assessed for losses due to "nonproductive plant" and for "operating loss" were not supported by any competent evidence of record.

## FACTS

The agreement upon which these appeals are based is evidenced by two handwritten memoranda, signed by the parties, which were executed on May 21, 1972, in the Greyhound Bus Terminal in Philadelphia.[2] The memoranda set forth the agreement of the plaintiff to sell, and the defendant to buy, twenty-five automotive spring manufacturing machines for the sum of $42,250.00. One memorandum stated that the machines were to be "working and running" while the other stated only that they were to be "working." The machines had been purchased earlier by Merion at a public sale in Detroit. Merion first offered the machines for sale at the end of April, 1972, while they were still in Detroit. Muelles learned through a broker that the machinery was offered for sale and Muelles' president, Luis Garcia Torres, and its general manager, Emilio Cano Bazaldua, traveled to Detroit. There the two men made a superficial inspection of the equipment. At that time, the machines were partially disassembled and being prepared for shipment to Merion's plant in Philadelphia. Torres and Cano accepted Merion's invitation to inspect the machinery more thoroughly in Philadelphia and they visited Merion's plant accompanied by a Mr. Mota, an engineer hired in Detroit for the purpose of assisting in the inspection. At the end of this visit, the memoranda were signed.

2. There is no dispute that a contract was in fact formed. The two memoranda consisted of a list briefly describing the equipment which was the subject of the sale. On the back of each list was a note setting forth the terms of the deal. The note endorsed by Merion's representative stated in full:

I accept to send you this twenty-five (25) equipment working. Will check by Mr. Mota, cost you $42,250.00.

The full text of the note signed by Muelles' representative stated: We accept to buy this twenty-five (25) machine. No controls in the furnace, and no packing, no freight, no rigging, but working and running by $42,250.00.

Subsequent to the formation of the agreement and upon Merion's request, Muelles forwarded a check to Merion in the amount of $2,000.00 as a deposit on the full purchase price of the machinery. In an accompanying letter, Muelles stated that it expected the machines to be delivered "working and running to our satisfaction." On June 5, 1972, Merion responded, denying having committed itself to turn over the machinery in such condition as to satisfy Muelles, but stating that it would comply with the terms set out in the memoranda. Merion again wrote to Muelles on July 25, 1972, and demanded that Muelles pay the balance due on the purchase price or storage charges of $8,000.00 or forget about the transaction and forfeit the sum already paid. In response, Muelles offered information legitimizing the delays. It informed Merion that the Mexican government had altered the regulations governing the importation of machinery and that it was seeking legal advice as to how to proceed with respect to obtaining an import license.

Having failed to obtain the requested payment, on July 30, 1972, Merion again wrote to Muelles demanding this time only that the Mexican firm pay the additional deposit of $8,000.00 demanded on July 25. On August 30, 1972, Muelles sent a check to Merion in the amount of $6,000.00 and promised to send $2,000.00 more the following week. Muelles also informed Merion that it required six pictures and detailed specifications for each machine from Merion in order to procure the necessary import license. Muelles was tardy in sending the additional $2,000.00. On October 6, 1972, Merion demanded that Muelles pay the $2,000.00 plus one-half of the handling and loading charges, a total sum of $3,450.00. Merion stated that, should payment not be made within seven days, "we will assume that you are no longer interested in the equipment and you may consider your advance money as compensation for liquidated damages." These demands were renewed on October 18. On October 21, 1972, Muelles sent a check for $2,000.00. In an accompanying letter, Muelles agreed to pay the extra charges, but asked for an adjustment in the date from which these

storage and handling charges began to accrue. Muelles also again sought the information it required to obtain an import license. Both by letter and cable, on October 30, Merion again demanded payment of $3,400.00.

On November 1, 1972, however, matters took a turn for the better. By letter, Merion assured Muelles that "we are trying to cooperate with you" and acknowledged receipt of the October 21st letter. After setting forth a calculation showing $36,150.00 due on account, Merion asked that Muelles pay $16,150.00. On November 16, 1972, Merion again wrote to Muelles stating that it was sending two pictures of each machine and "whatever information we had available to us." Merion stated that it performed these tasks as "a favor to you at no charge" but suggested that, if Muelles needed anything further along these lines, it contact someone else to do the work. Merion closed by saying, "we have done more than we should and insist upon payment of an additional $16,150.00 ...." This demand was renewed on December 1, 1972, and again Merion threatened to sell the equipment if payment was not tendered within seven days.

In January, 1973, a Merion representative then in Mexico received an additional $10,000.00 on account. Relations between the two parties were stable for two months, but in March, Merion twice demanded that Muelles make an additional payment of $8,000.00. During the Spring of 1973, Muelles completed construction of the plant intended to house the twenty-five machines. In June, 1973, Cano again visited Philadelphia in order to make a final inspection of the equipment and tender final payment of the balance then due. However, this inspection disclosed that some of the machines had been canibalized and some parts were missing. Moreover, some of the machines were missing altogether and few, if any, were in operable condition. Cano returned to Mexico without making any payment and without the machinery. By letter, On June 29, 1973, Muelles informed Merion as to some of the defects revealed by the inspection. On July 12, 1973, Merion informed Muelles by

letter and confirming cable that it considered Muelles to be in default and that a public sale of the machinery would be held on July 20, 1973. At the sale, Merion purchased the machinery for a nominal sum. Thirteen months later, Merion filed suit for the balance of the purchase price and the expenses of storage and handling.

## SCOPE OF REVIEW

■ Our initial task in this case, as in every case which we undertake to review, is to determine our proper scope of review. In the case before us, the trial judge heard the testimony without a jury pursuant to Pa.R.C.P. No. 1038. As permitted by that rule, the trial judge made only general findings of liability as to all parties and he disposed of all claims for relief. *See* Rule 1038(b). He did not, as is within his discretion, avail himself of the opportunity of entering specific findings of fact or conclusions of law. *Id.* In its turn, the court *en banc* reviewed only the general decision of the trial judge and did not itself make any specific findings of fact. Because there have been no findings of fact approved by the court *en banc*, this case does not come within the well-settled rule that the findings of a trial judge approved by a court *en banc*, if supported by competent evidence and in the absence of an error or law or abuse of discretion, will be given the weight of a jury verdict and will not be disturbed on appeal. *See, e.g., First Pa. Banking and Trust Co. v. Liberati*, 282 Pa.Super. 198, 203, 422 A.2d 1074, 1076 (1980) and cases there cited.

In determining our scope of review under these circumstances, we look to the language of Rule 1038 and its apparent purpose. Promulgated in 1969, Rule 1038 abolished the prior practice of requiring trial judges in non-jury trials to enter detailed findings of fact and conclusions of law upon the request of any party to the lawsuit. *See* Act of April 22, 1874, P.L. 109, as amended, 12 P.S. § 689, *suspended* by Pa.R.C.P. No. 1038(f)(1), *repealed* by the Act of April 28, 1978, P.L. 202, 42 Pa.C.S.A. § 20002(a) [634]. Instead, as noted above, Rule 1038(b) provides that:

The decision of the trial judge may consist only of general findings as to all parties but shall dispose of all claims for relief. The trial judge may, *if he wishes*, include as part of the decision specific findings of fact and conclusions of law with appropriate discussion. (Emphasis added.)

Furthermore, Rule 1038(d) requires that every "trial of an action in assumpsit, by a judge sitting without a jury, *shall be conducted as nearly as may be as a trial by jury is conducted ....*" (Emphasis added.) Parallel rules of civil procedure promulgated simultaneously with Rule 1038 direct that other non-jury actions also follow this requirement. *E.g.*, Pa.R.C.P. Nos. 1048 (trespass), 1058 (ejectment), and 1067 (quiet title). *See* 434 Pa. lx–lxvi (1969). In 1972, the Supreme Court promulgated Rule 1007.1 which requires any party seeking a trial by jury to take the affirmative step of demanding such a trial. This rule abolished the prior practice in civil cases of allowing cases to be tried before a judge sitting without a jury only upon agreement of the parties. *See* Act of April 22, 1874, P.L. 109, 12 P.S. § 688 *repealed* Act of April 28, 1978, P.L. 202, 42 Pa.C.S.A. § 20002(a) [634]. Thus, the general rule has shifted and no longer outwardly favors trial before a jury over non-jury trials.[3] Additionally, in 1977, the Supreme Court simultaneously promulgated Pa.R.C.P. No. 227.1 and amended Rules 1038 and 1518. These changes made uniform in both jury and non-jury trials the time requirement for filing exceptions or post-trial motions.

From these developments we draw three conclusions. First, many of the procedural differences between jury and non-jury trials have been recently eliminated. Second, one of the purposes behind the rule changes is to induce litigants and trial judges to utilize the potentially speedier and

---

**3.** The present practice formerly prevailed in Allegheny County only, *see* Act of May 5, 1981, P.L. 198, as amended, 17 P.S. § 634, *repealed* Act of April 28, 1978, P.L. 202, 42 Pa.C.S.A. § 20002(a) [940], while in Philadelphia County, parties were required to endorse their initial pleadings indicating whether they did or did not wish to proceed before a jury. *See* Act of July 12, 1913, P.L. 711, as amended, 17 P.S. § 695, *repealed* Act of April 28, 1978, P.L. 202, 42 Pa.C.S.A. § 20002(a) [975].

less expensive method of trying cases before a judge without a jury in an effort to cope with ever increasing caseloads. Time is conserved under Rule 1038 by dispensing with the selection and instruction of the jury as well as the elimination of the preparation of detailed findings and conclusions. Finally, in the absence of a demand for a jury trial, there is a tacit agreement of the parties that the trial judge sits as the arbiter of both law and fact. The parties impliedly agree that the fact-finding function normally associated with and reserved to the jury can adequately be performed by the trial judge. The trial judge's competence to perform this function lies at the bottom of the modern movement to make it easier to try cases in this manner. It is now permissible for even the form of the decision to resemble a verdict rendered by a jury. Therefore, third, we conclude that a general decision rendered by a trial judge sitting without a jury, should be reviewed by the same standards and accorded the same deference as a general verdict rendered by a jury.[4]

**4.** We recognize that there is some authority holding that where, as here, there are no findings or conclusions entered by a trial judge after a non-jury trial, both the court *en banc* and the appellate courts "... must review the entire record ... and attempt to *make our own determination of the facts.*" *Ballinger v. Howell Manufacturing Co.,* 407 Pa. 319, 322, 180 A.2d 555, 556 (1962) (action in assumpsit) (emphasis supplied). Accord: *Idell v. Falcone,* 427 Pa. 472, 474, 235 A.2d 394, 395 (1967) (assumpsit); *Yoo Hoo Bottling Company of Pennsylvania v. Leibowitz,* 432 Pa. 117, 119, 247 A.2d 469, 470 (1968) (equity); *Exton Drive-In, Inc. v. Home Indemnity Co.,* 436 Pa. 480, 486, 261 A.2d 319, 323 (1969), cert. denied, 400 U.S. 819, 91 S.Ct. 36, 27 L.Ed.2d 46 (1970) (assumpsit) (plurality opinion in which three justices joined; two justices concurred only in the result; two justices dissented); *Smith v. Peacock Construction Co.,* 214 Pa.Super. 324, 326, 257 A.2d 592, 593 (1969) (assumpsit); *First Trinity Evangelical Lutheran Church Appeal,* 216 Pa.Super. 379, 381, 268 A.2d 219, 220 (1970) (statutory proceeding by petition); *Thompson v. Equitable Life Assurance Society of the United States,* 218 Pa.Super. 339, 344, 279 A.2d 225, 227 (1971) (assumpsit) (dissenting opinion), reversed, 447 Pa. 271, 275–276, 290 A.2d 422, 424 (1972) (upholding views of Superior Court dissent). Of these cases, only in the last did the trial take place after the promulgation of Rule 1038. *See Thompson,* 447 Pa. at 273, 290 A.2d at 423. No case has been found dealing with this precise point after *Thompson.*

On the whole, these cases are not well-supported by prior precedent and provide no thoughtful analysis supporting the adoption of that

■ Accordingly, in assessing Merion's claim that the verdict is against the weight of the evidence, we consider all of the evidence and assess its weight to determine whether the trial court committed clear error or palpably abused its discretion. In the absence of an error of this magnitude, the appellate courts will not overturn the verdict even where, judged by the record before us, it is against the preponderance of the evidence. *Coyne v. John Gibbons Coal Co.*, 314 Pa. 502, 506, 172 A. 653, 654–655 (1934); *McRay v. Pittsburgh Railway Co.*, 132 Pa.Super. 386, 393, 200 A. 717, 720 (1938).

■ The other two questions properly before us present issues concerning the legal sufficiency of the evidence presented at trial. Merion contends in this court as it did before the trial court that there is no evidence of record to support a damage award for losses due to "nonproductive plant" and "operating loss." Furthermore, Merion argues, and the court *en banc* so held, that Muelles' evidence of lost profits was insufficient as a matter of law to allow compensation for any such loss. Were we here deciding an appeal from a jury verdict, these issues would be cast as chal-

standard. Furthermore, these cases are irreconcilable on the manner in which to employ this fact-finding function and no standards have been set for the proper weight to be accorded the general findings or any opinions produced by the trial judge or the court *en banc.* Furthermore, to allow what is essentially a retrial before an appellate court is anomalous. *See Spatz v. Nascone*, 283 Pa.Super. 517, 544, 424 A.2d 929, 942–943 (1981). We have not had the opportunity of seeing and hearing the witnesses which is so essential to the proper performance of the fact-finding function. Finally, adherence to and application of this standard of review would either directly contravene the provisions of Rule 1038(b) by placing a *de facto* requirement upon the trial courts to enter detailed findings and conclusions or, in the alternative, would strangle the appellate process by imposing a burden which appellate courts are ill-equipped to bear. For these reasons, as well as for those stated in the text, we depart from this precedent.

We also wish to note that we are not here confronted with a situation where the court *en banc* has with the participation of the trial judge, altered a finding of fact originally entered by that judge, cf. *First Pennsylvania Savings Association v. Four Seasons Racquet Club, Inc.*, 287 Pa.Super. 180, 429 A.2d 1160 (1981), nor where the court *en banc* has entered its own findings of fact when none were entered by the trial judge.

lenges to the court *en banc's* denial of a Judgment N.O.V. on the one hand and a grant of a Judgment N.O.V. on the other. We have held *supra,* that where, as here, a trial judge sitting without a jury renders a general decision without entering specific findings and conclusions and the court *en banc* reviews that decision, without itself rendering such findings and conclusions, we review the trial judge's general decision as we would a general jury verdict. Therefore, despite a shift in vocabulary which we discuss below in more detail, we will apply to these two claims the familiar standards relating to the granting or denial of a Judgment N.O.V. after a general jury verdict:

> A judgment notwithstanding the verdict should be entered only in a clear case, when the facts are such that no two reasonable persons could fail to agree that the verdict was improper; any doubts should be resolved in favor of the verdict winner. The evidence must be considered in the light most favorable to the verdict winner, giving him the benefit of every reasonable inference of fact arising therefrom, and any conflict in the evidence must be resolved in favor of the verdict winner. *Martin v. Soblotney,* 296 Pa.Super. 145, 168–169, 442 A.2d 700, 702 (1982) (petition for allowance of appeal granted 9/14/82) (citations omitted).

### No. 1418: Merion's Appeal

#### A.

█ In claiming that the decision in favor of Muelles on the issue of liability was against the weight of the evidence, Merion argues that the trial judge and the court *en banc* arbitrarily disregarded evidence of Muelles' delay in taking delivery of the machines, presumably establishing that Muelles breached the contract. We disagree. First, the memoranda memorializing the agreement did not specify any time for the completion of performance. Also, the delays by Muelles were beyond its control. The court *en banc* aptly observed that the delays were caused by an unexpected change in the Mexican government's import

regulations and unforeseeable delay in the construction of Muelles' plant. It also appears that Merion agreed to store the machines for Muelles once Muelles tendered assurances that it would pay the extra charges involved. Muelles did in fact make payments totalling $20,000.00, almost half of the original purchase price, as evidence of its desire to keep the transaction alive. The court *en banc* reasoned further as follows:

> The seller [Merion] purchased machinery, some of which was forty years old, disassembled and to be transported to another city. It is reasonably assumed that upon a subsequent agreement to sell the machinery in working and running condition, the subsequent buyer [Muelles] may justifiably expect the seller to reassemble and test the machinery to assure the buyer of the operability of the equipment. [Merion] was fully aware that [Muelles] sought to use the machinery for its intended purpose, making automobile springs. Although [Merion] denies having obligated itself to test the machinery, the court finds [Muelles] refusal to make final payment prior to a demonstration of the working and running condition of the machinery ... a reasonable precaution in international trade and not a breach. [Merion's] obligation to put the machinery in running and working condition was thus a condition precedent to [Muelles'] obligation to make full payment. The court finds th[at Merion] breached the contract when it failed to sell and deliver the machinery in good working order.

Our review of the trial record convinces us that there is ample evidence of record to support the conclusions of the trial judge and the court *en banc* that Merion breached the contract. Furthermore, the parties' correspondence concerning the delays may be readily construed to support a finding that any delay on the part of Muelles was excused or agreed to by Merion. Merion's subsequent failure to put the machinery in working order, however, has not been excused. Finding no error or abuse of discretion, we there-

fore affirm that part of the order of the court *en banc* dismissing Merion's exceptions on the issue of liability.

### B.

In regard to Merion's claim that the evidence was insufficient as a matter of law to sustain a damage award for losses sustained for "nonproductive plant," and "operating loss," we are confronted with a different situation. After a thorough review of the record, we conclude that there is no evidence which supports the assessment of these damages. There were only two figures mentioned during the trial relating to damages other than amounts related to calculation of lost profits and the amount paid by Muelles toward the purchase price of the equipment. The first of these is an offer of proof by Muelles' counsel that Muelles' losses for nonproductive plant and operating loss "... have been $12,395.83 ..." (N.T. Vol. I, 12/4/78, p. 121.). The second figure—"about $2,000.00, $1,000.00"—was given in response to a question regarding the proportion of total losses in one year represented by amortization of the building constructed to house the machinery. Merion's counsel objected to the admission of the evidence and moved to strike. After a brief discussion the trial judge agreed. (N.T.Vol. I, 12/4/78, pp. 124–125).

Needless to say, neither an offer of proof nor properly stricken testimony can serve as evidence upon which to base an award of damages. The record is otherwise totally barren of any evidence of the extent of these damages. As a matter of law, therefore, the evidence was insufficient to sustain an award of these elements of damages and the court *en banc* should have sustained Merion's exceptions in this regard. Accordingly, we reverse that part of the order of the court *en banc* dismissing Merion's exception to the grant of such damages.

### *No. 1343: Muelles' Appeal*
### A.

Initially we conclude that two of the questions raised by Muelles, those regarding the absence of a specific

amount for interest and the lack of quality of the transcript of testimony, are not properly before us. As described above, Muelles failed to file any exceptions whatsoever and made no attempt to obtain leave of court pursuant to Pa.R.C.P. Rule 1038(d) to do so, even though more than three months elapsed between the filing of the transcript and the briefing of Merion's exceptions commenced. Additionally, Muelles has not sought to correct or modify the record pursuant to Pa.R.A.P. 1926. Furthermore, there was more than a year for Muelles to seek leave with respect to the form of the verdict. Rule 1038(d) expressly provides that issues not raised in the exceptions are waived. *Zvonik v. Zvonik*, 291 Pa.Super. 309, 316 n. 4, 435 A.2d 1236, 1240 n. 4 (1981). *See also In re: Estate of Litostansky*, 499 Pa. 321, 453 A.2d 329 (1982). Muelles has therefore waived these two issues.

## B.

Muelles' challenge to the propriety of the entry of a "Judgment N.O.V." presents a question which is far more substantial. First, we note that "Judgment N.O.V." is no longer in the legal lexicon with respect to trials without a jury. Rule 1038(d) states in part:

> No motion for a new trial, for judgment non obstante veredicto [judgment N.O.V.], in arrest of judgment or to remove a nonsuit may be filed.

Furthermore, Rule 1038(e) specifies the permissible range of actions which may be taken by the court *en banc* in ruling on post-trial exceptions where the trial judge heard the case without a jury:

> [E]xceptions shall be heard by the court en banc, which shall sustain or dismiss them in part, affirm, modify or reverse the decision, direct the entry of judgment in favor of any party, or order a new trial as to all or any of the issues or parties.

As set forth above, the court *en banc* concluded that proof of Muelles' lost profits was "uncertain" and that the possibility of such profits occurring in the absence of Merion's

breach was, as a matter of law, too "speculative" and too "remote" to permit levying such damages. The court also relied on the status of Muelles as a new business "unestablished and inoperable for spring manufacturing purposes." The court *en banc* therefore sustained Merion's exception to the damages awarded for lost profits but dismissed Merion's exceptions to the general finding of liability and the damages assessed for nonproductive plant and operating loss. This portion of Muelles' appeal thus questions the propriety of the court *en banc's* order sustaining Merion's exception as to the lost profits awarded by the trial judge.

■ Although this change in vocabulary has occurred, we do not understand that the Supreme Court intended any alteration in the standards we are to apply in assessing the propriety of the court *en banc's* action. We believe the change in procedure wrought by Rule 1038 was intended to strengthen the finality of a decision rendered by the trial judge sitting without a jury. Thus, where the court *en banc* substitutes its judgment for that of the trial judge, thereby taking the case away from the trier of fact, due respect for the trial judge's fact-finding function requires that such substitution be made "only in a clear case" in accordance with the standard set forth in *Martin v. Soblotney, supra.* Where the trial judge makes no detailed factual findings, and the court *en banc,* also without making factual findings, rules that the evidence is insufficient, as a matter of law, to support the trial judge's general decision, it may do so only after reading the testimony most favorably to the verdict winner, resolving all conflicts therein in favor of the prevailing party, and giving the verdict winner the benefit of all facts and inferences reasonably deductible from the evidence so read. *See Axilbund v. McAllister,* 407 Pa. 46, 49, 180 A.2d 244, 246 (1962). Our review of the record in light of the foregoing standard convinces us that the court *en banc* erred in sustaining Merion's exception to the trial judge's award of lost profits damages in favor of Merion.

■ There is no dispute that this is a proper case for awarding consequential damages for lost profits. Merion was aware that Muelles sought to purchase the twenty-five machines as a means of starting operations in a new automotive spring manufacturing plant being built in Mexico. Thus, at all times, Merion had reason to know that lost profits would likely result from a material breach on its part. *See R.I. Lampus Co. v. Neville Cement Products Corp.*, 474 Pa. 199, 378 A.2d 288 (1977). The only question presented is whether sufficient proof of such losses was adduced at trial to support the trial judge's award.

■ Damages for lost profits, like other contract damages, may not be awarded when the evidence leaves the trier of fact without any guideposts except his or her own speculation. Sufficient evidence must be introduced to permit a reasonably certain estimate of the amount of anticipated profits lost due to the breach. *Commonwealth Trust Co. of Pittsburgh v. Hachmeister Lind Co.*, 320 Pa. 233, 238–243, 181 A. 787, 789–790 (1935); *Gaudy v. Seaman*, 188 Pa.Super. 475, 149 A.2d 523 (1959). Damages for lost profits are usually a matter readily susceptible of proof when a business is established and continuing, *Hachmeister Lind Co., supra* (business began fourteen months before breach, continued for two years between breach and before trial), or when a business later establishes itself in a comparable market, *Gaudy v. Seaman, supra* (business began 8½ months before breach, upon breach business ceased for 1½ years, business was reestablished and operated for two years prior to trial). For an entirely new business,[5] however, the certainty requirement has been an insurmountable barrier to obtaining an award for lost anticipated profits. *Exton Drive-In, Inc. v. Home Indemnity Co.*, 436 Pa. at

---

**5.** Muelles argues that Merion has failed to preserve its "new business" argument on appeal. However, the issue was briefed and argued before the court *en banc* without objection from Muelles. Furthermore, the court *en banc* relied upon Muelles' status as a new business in partial justification for the entry of its order sustaining Merion's exception to the award of lost profits damages. We conclude, therefore, that this issue is properly before us.

487–490, 261 A.2d at 324–325; *Pollock v. Morelli,* 245 Pa.Super. 388, 397–398, 369 A.2d 458, 462–463 (1976). Although some jurisdictions have held that new businesses cannot, as a matter of law, submit sufficient evidence to obtain an award for lost profits, *see* cases collected 22 Am.Jur.2d, Damages, § 173, we are not directed to nor can we locate any such authority in Pennsylvania. Rather, in the cases cited above, the courts of this Commonwealth have adopted the rule suggested by Restatement, Contracts § 331(1),[6] and Restatement, Second, Contracts § 352,[7] that new businesses may be able to adduce sufficient evidence to obtain an award for lost profits while recognizing that such proof is often more difficult to obtain and present. Restatement § 331 was cited with approval in both *Hachmeister Lind Co.,* 320 Pa. at 243, 181 A.2d at 791, and *Exton Drive-In,* 436 Pa. at 488–489, 261 A.2d at 324. Comment c to that section states:

> The present section does not purport to divide profits into kinds of classes .... Speculative profits are those the evidence of which is so meager or uncertain as to afford no reasonable basis for inference. The rule applicable to profits is in no respect different from that applicable to all gains prevented or losses suffered; it is proving income and outgo that the amount of any kind of profit is established. The kind and amount of evidence that will be held to afford a sufficient basis for estimation varies greatly in different kinds of cases.

We understand our cases to stand for no different principle.[8]

**6.** Restatement, Contracts § 331(1) states:
 Damages are recoverable for losses caused or for profits and other gains prevented by the breach only to the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty.

**7.** Restatement, Second, Contracts § 352 states:
 Damages are not recoverable for loss beyond an amount that evidence permits to be established with reasonable certainty.

**8.** We must reject Muelles' argument that these authorities call for a two-step analysis, namely, that reasonable certainty is required only to

█ This rule is salutary, for it reduces the weight given the age of the business from determinative on the point of lost profits, to a factor, albeit a relatively important one, to be taken into account in weighing and analyzing the evidence. Because there is no business history from which to reasonably predict subsequent events, the evidence must be substantial and it must be shown to have a close relationship to the individual firm in question as well as the relevant economic and financial conditions prevailing at the time the losses occurred. As the Restatement, Second, suggests, lost profits from a new business

> may be established with reasonable certainty with the aid of expert testimony, economic and financial data, market surveys and analyses, business records of similar enterprises, and the like. Restatement, Second, § 352, Comment b.

*See also* Restatement § 331, Comments b and d, Illustrations 6 and 8.

This court's recent opinion in *General Dynafab, Inc. v. Chelsea Industries, Inc.*, 301 Pa.Super. 261, 265–66, 447 A.2d 958, 960 (1982), supports this view. Plaintiff Dynafab, although "arguabl[y] ... a newcomer," showed that there was significant interest in its product before Chelsea breached the contract and demonstrated through various means what it estimated to be its lost profits. Most importantly, the court made the following observation:

> Evidence was submitted also concerning the projected sales, raw material needs and profitability of the plant .... *Clearly, this evidence is not entirely of an unspe-*

establish the fact of loss and a less precise standard (or even no standard whatsoever!) to determine the amount of the loss. (Brief for Muelles, p. 17.) On the contrary, our cases stand for the proposition that reasonable certainty is required for both the fact of loss and the amount of loss sustained. Additionally, we note that this is not a requirement of mathematical certainty, but only that the estimate made as to the amount of lost profits be reasonably certain. The process of estimation, of course, need not be completely free of analytical or statistical error for that is the nature of an estimate. However, the requirement of reasonable certainty as to the amount as well as to the fact of loss assures that the finder of fact will not determine the rights of any party upon the basis of speculation.

*culative nature, however, ... if the jury believed it, it [the jury] could come to a reasonable determination as to damages resulting from loss of future profits. Id.* While we do not here review the verdict of a jury, we have determined that our scope of review is essentially the same. Thus, the crucial question remains whether, as a matter of law, Muelles put on the record sufficient credible information to permit a reasonable estimate of its lost profits. With this discussion in mind, we proceed to an evaluation of Muelles' evidence.

■■■ The only witness to testify as to Muelles' lost profits was its general manager, Emilio Cano Bazaldua.[9] Cano provided a wealth of details concerning economic and financial conditions prevailing in Mexico during the four years following the completion of construction of the plant intended to house the machinery. Cano provided specific data concerning the Mexican government's protection of domestic manufacturing, estimated plant production, prices, direct and indirect labor cost, the cost of skilled and supervisory labor, administrative and sales staff and operations expense and the broad outlines of the applicable tax structure. The figures he produced came from his own knowledge; either he personally developed the data in his capacity as Muelles' general manager or he was aware of the prevailing rates and figures because of his long association with the automobile parts industry. Cano also took into consideration the devaluation of the Mexican peso in September, 1976. At almost every point, Cano utilized patently conservative data in estimating Muelles' lost profits, forcing estimated income down and estimated expenses up. Under ideal or even under more realistic conditions, Muelles' lost profits could have been substantially higher. Cano stated that he and his accountants arrived at a total estimated lost profits of $325,000.00 for the four-year period 1974–1977. Finally, we note that, while Cano did not himself perform any

9. At trial, Luis Garcia Torres, president of Muelles, was also called to the stand. However, counsel for both parties stipulated that Torres' testimony "... in main ... would be that same as the previous witness," i.e., Cano.

mathematical calculations while on the stand, he sufficiently explained the necessary operations to enable the fact finder to perform them. We conclude that, based on the testimony of Cano, there is sufficient evidence to permit a reasonable estimate of Muelles' lost profits in the amount originally awarded by the trial judge, $200,000.00.

Cano's testimony was admitted and allowed to remain on the record over the strenuous and repeated objections of counsel for Plaintiff Merion. Merion does not now contest the admissibility of this evidence. Furthermore, in overruling Merion's objections at trial, the trial judge stated that "the testimony will remain in; that I would give it whatever pro[b]ative value it is worth." (N.T.Vol. II, 12/5/78, p. 46.) The general decision rendered by the trial judge indicates that he found Cano to be a credible witness. Not being in a position to observe Cano and draw our own conclusion as to his veracity, but finding no inherent contradictions or unreliability in his recorded testimony, we too conclude that Cano's testimony is credible. We also note that Merion's counsel could not shake Cano's testimony during cross-examination and that Merion presented no testimony to rebut or contradict those matters which Cano asserted to be fact.

The court *en banc* concluded, and Merion here argues, that the evidence of lost profits was "remote," "speculative," and "not proved at trial to a degree of certainty that would warrant the grant of those damages." (Op.Ct. *En Banc* at 7.) However, the court *en banc* never explained why it so found or in what respect the evidence was lacking. In other contexts, the Pennsylvania Supreme Court has attempted to discourage the practice of writing opinions in conclusory terms unsupported by analysis or discussion. *Scaife Co. v. Rockwell-Standard Corp.*, 446 Pa. 280, 290, 285 A.2d 451, 456 (1971), and cases there cited. The court *en banc* did discuss the proper legal standard to be applied in this case, but nowhere can we find any explanation of its application. The court moved directly from its discussion of the applicable legal standard to its result without informing us of how it got there. We therefore add "remote, ...

speculative, ... and uncertain" to the list of conclusory terms cited with disapproval by the court in *Scaife Co., supra.*

We also reject Merion's attempt to convince us that the flaws in the data quoted by Cano require that we reject his testimony. We find observations made almost thirty years ago an apt answer to Merion's arguments on this point.

> [D]amages in such a case as this cannot be determined with mathematical certainty and ... a defendant who has broken a contract should not be allowed to profit by his breach because of the difficulty in fixing damages with exactness ....

> It is not difficult to shoot these estimates full of holes as the [plaintiff] has done. On the other hand, ... [w]e do not think this is a case where it can be really said that there would have been no profit ... had the contract been performed. We think there would have been some profit. As to the amount, we do not see that our estimate can be any better than that of the trial judge and we are satisfied with what he has done .... *Smith v. Onyx Oil and Chemical Company*, 218 F.2d 104, 110, 111–112 (3d Cir. 1955).

The United States Court of Appeals for the Third Circuit has also allowed recovery for lost profits where some of the evidence submitted was "pretty highly speculative." *Stentor Electric Manufacturing Co., Inc. v. Klaxon Co.*, 115 F.2d 268, 274 (3rd Cir.1940), reversed on other grounds, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). This court has also recognized that proof of lost profits "is not entirely of an unspeculative nature ...." *General Dynafab, Inc. v. Chelsea Industries, Inc.*, 301 Pa.Super. at 266, 447 A.2d at 960. Such must always be the case because, as a consequence of the breach, the injured party was not only deprived of whatever profits it would have made from the transaction, but it has also been deprived of the business records necessary to determine these profits with specificity. The only situation in which specificity could have been

maintained is now lost due to Merion's course of action breaching the contract. Having committed the breach, Merion cannot now be heard to complain about imprecision in the method of estimating the profits lost to Muelles. *See also Hachmeister Lind Co.*, 320 Pa. at 239–243, 181 A. at 790–791.

Furthermore, the imprecision encountered in this case is no greater than that encountered in survival actions brought by the estates of minors where the future earnings of the decedent minors are calculated through the use of statistical averages and future possibilities which no longer have a chance of becoming reality. *See, e.g., McClinton v. White*, 497 Pa. 610, 613–615, 444 A.2d 85, 86 (1982); *Hall v. George*, 403 Pa. 563, 556–567, 170 A.2d 367, 369 (1961). The figures relied upon by Muelles in this case are, for the purpose of calculating lost profits, very conservative estimates of what would have been likely to happen had Merion not breached. These estimates bear a strong relationship to the factual situation and the circumstances of Muelles. Finally, we observe that an award of $200,000.00 for lost profits represents only $50,000.00 per year over the first four calendar years after Merion's breach and the completion of Muelles' plant. Under the very different conditions prevailing in Mexico than in the United States during the time in question, we do not believe that such an award is at all unwarranted.

We therefore reverse that part of the order of the court *en banc* sustaining Merion's exception to the award for lost profits damages and reinstate the original award of $200,-000.00 in favor of Muelles originally entered by the trial judge.

We therefore remand this case to the trial court for the entry of judgment in favor of Muelles on the complaint and in favor of Muelles on its counterclaim in the amount of $220,000.00.

Jurisdiction is relinquished.