**In re SULAKSHNA, INC., Debtor.**

**SULAKSHNA, INC., J. Michael Kenney, Plaintiffs,**

v.

**TRANSMEDIA NETWORK, INC., Transmedia Restaurant Company, Inc., Defendants.**

**Bankruptcy No. 96–13303DAS. Adv. No. 97–0036DAS.**

United States Bankruptcy Court, E.D. Pennsylvania.

April 4, 1997.

---

James M. Matour, Middleman & Matour, P.C., Philadelphia, PA, for Plaintiffs.

Larry M. Keller, Sidkoff, Pincus & Green, Philadelphia, PA, for Defendants.

James E. O'Neill, III, Stradley, Ronon, Stevens & Young, Philadelphia, PA, for International House of Philadelphia.

Frederic Baker, Ass't U.S. Trustee, Philadelphia, PA.

## OPINION

DAVID A. SCHOLL, Chief Judge.

### A. INTRODUCTION

Before us for decision is the instant proceeding ("the Proceeding"), brought by SULAKSHNA, INC. ("the Debtor") and its principal, J. MICHAEL KENNEY ("Kenney") (Kenney and the Debtor are collectively referenced as "the Plaintiffs"), against TRANSMEDIA NETWORK, INC. ("the Network") and TRANSMEDIA RESTAURANT COMPANY, INC. ("the Restaurant Co.") (the Network and the Restaurant Co. are collectively referenced as "the Defendants"). The Plaintiffs seek specific performance of the Defendants' alleged contract to advance a $50,000 loan balance to them, plus alleged consequential damages of $331,121.33.

Although we find that the Plaintiffs have established a liability of the Defendants for breach of the underlying contract, we find that, in light of the heightened burden to be met when damages based on lost profits of a new business are at issue, the Plaintiffs have not proven that they will suffer damages measurable with sufficient certainty. Therefore, we will limit their damages to a forgiveness of $50,000 of the Plaintiffs' $100,000

liability to repay the unremitted $50,000 loan balance, escalated by $5,000 weekly if the Defendants fail to make the remittance in timely fashion.

## B. PROCEDURAL AND FACTUAL HIS-TORY

The Debtor filed the underlying voluntary Chapter 11 bankruptcy case on April 12, 1996. A week later, on April 19, 1996, the Debtor's landlord, the International House of Philadelphia ("the Landlord"), filed a motion seeking relief from the automatic stay. The Landlord's vigor in pursuing relief, which did not abate even after a plan of reorganization was finally confirmed on October 30, 1996, was ignited by the Debtor's long delay in refurbishing a large restaurant in the midst of the Landlord's multi-use facility, built to accommodate foreign students at the nearby University of Pennsylvania ("Penn") and other schools.

After a hearing of May 15, 1996, on the Landlord's motion for relief, we entered an Order of May 16, 1996, conditioning the stay on the Debtor's (1) moving to assume its lease by May 31, 1996; (2) prevailing on such a motion at a hearing of June 12, 1996; and (3) promptly filing a plan and disclosure statement by a date to be established at the hearing on June 12, 1996. After the June 12 hearing, an Order of June 14, 1996, was entered, permitting assumption of the lease and requiring the Debtor to file a plan and accompanying disclosure statement by July 31, 1996.

The Order allowing assumption of the lease required the Debtor to maintain rental payments and cure an agreed rental delinquency of $15,398.48 by October 12, 1996. The Plan confirmed on October 30, 1996, relied on funding by certain Japanese investors in the amount of about $200,000, and loans from the Defendants, as described below, in a total amount of $100,000.

When the $15,398.48 was unpaid, the Landlord continued its pressure on the Debtor, filing a new motion seeking relief from the automatic stay or conversion of the case to Chapter 7 on December 24, 1996. On January 17, 1997, the Friday before the hearing date of January 22, 1997, on the Land-lord's latest motion, the Debtor filed the Proceeding and a motion seeking what the Plaintiffs termed a "preliminary injunction" against the Defendants ("the Motion"), to require them to immediately remit the $50,-000 loan balance to the Debtor. Despite the Debtor's request for a hearing on the Motion on January 22, 1997, contending that relief on the Motion was necessary to make the requisite payments to the Landlord, we determined that further notice to the Defendants was necessary, and we scheduled the hearing on January 29, 1997.

Counsel for the Debtor and the Landlord appeared on January 22, 1997, and announced a settlement of the Landlord's motion. The dictated terms allowed the Debtor an extension until February 15, 1997, to remit the regular rent and a $7,000 additional payment on account of back rent to the Landlord. We informed counsel that we would require notice to be given under Federal Rule of Bankruptcy Procedure ("F.R.B.P.") 9019 before we would approve the settlement. No F.R.B.P. 9019 motion nor any written stipulation memorializing this agreement between the Debtor and the Landlord has ever been presented to this court. Therefore, no settlement has been approved, and, because of the extensive delay in the remittance of the Stipulation, the status of this agreement is somewhat unclear. The Landlord's motion will shortly be scheduled for a hearing to show cause why the motion should not be dismissed pursuant to Local Bankruptcy Rule 7041.2, permitting the court to dismiss matters in which settlement motions are not filed within thirty (30) days after commenced settlements.

On January 27, 1997, the Defendants filed a motion to dismiss the preliminary injunction Motion, alleging, *inter alia,* that the settlement of the Landlord's most recent motion for relief rendered it impossible for the Plaintiffs to establish the requisite irreparable harm. Nevertheless, the hearing of January 29, 1997, went forward. At its conclusion, we entered an order allowing the parties until February 7, 1997, to brief the Motion. We also advised the parties that, in light of the pendency of the Motion and the consequent alleged need for a prompt final

disposition, the established March 12, 1997, trial date of the Proceeding would not be continued.

The principal witnesses at the hearing were Kenney and Aman (Buzz) Barber, the Defendants' former regional sales manager who began negotiating with Kenney regarding a contract between the parties in spring 1995. He explained that the Defendants' principal business is the issuance of cards which provides its consumer members with discounts, usually twenty-five (25%) percent, at restaurants. While the Defendants presumably receive income from selling their memberships to the public, an important aspect of the Defendants' business is making loans to restaurants where its cards can be used. In exchange for such loans, the Defendants are entitled to recover the proceeds from the use of the borrower restaurants until twice the amount of the principal of the loan advanced, the so-called "Transmedia Credit," is paid. Therefore, if a borrower restaurant is successful, the Defendants can recover a double payment on their loan investments, and the payback period will be short if the restaurant is successful.

Kenney solicited the Defendants' financial assistance because, although Kenney had been successful in other restaurant ventures, the instant project of the Debtor needed capital. Because of Kenney's past successes, and his submission of sophisticated and optimistic written projections of the Debtor's venture to him, Barber remained in contact despite Kenney's delays in opening the restaurant for business.

On August 30, 1995, the parties signed the first contract, whereby the Restaurant Co. was to advance a total of $50,000 to P.R.M.C. ("PRMC"), an entity controlled by Kenney, under the terms of one of the Restaurant Co.'s standard form contracts. On April 10, 1996, Barber wrote to Kenney agreeing to his request to increase the advances to a total of $100,000, and a contract memorializing the $100,000 figure was executed on May 30, 1996. At the Debtor's request to replace PRMC with the Debtor as the contracting establishment, the parties' final contract of June 11, 1996, was executed ("the Contract"). The significant terms of the Contract, basi-

cally unchanged in form since August 30, 1995, were that the Restaurant Co. was to advance half of the sums to be paid ($50,000) when the Debtor opened for business, and the other half (another $50,000) thirty (30) days thereafter. These advances were to be repaid by the Debtor's allowing the Defendants to retain $200,000 in purchases made on the Defendants' cards.

The terms most critical to the instant dispute, relating to the contract terms setting forth the conditions under which the Restaurant Co. was relieved from making payment, read as follows:

6. In the event of either (1) the Establishment authorizing any other person or entity to take possession of any of its premises whether by subletting or assigning any of its leases, or by license agreement or by any other manner; (2) the sale, closing, bankruptcy or interruption of Establishment's business; (3) the Establishment making any material modification to its menu regarding price or type of food served; or (4) the Establishment changing the name under which it does business; the Establishment shall immediately refund to Transmedia in cash an amount equal to the unused portion of the Cash Cost, which shall be one-half of the dollar amount of the remaining Transmedia Credit.

7. If the terms of this contract provide for Transmedia to make payments after the date this agreement is executed, Transmedia may refuse to make payments if the Establishment fails to provide the financial documentation provided for in this paragraph, or should it determine, in its sole discretion, that the Establishment will be unable to provide the Transmedia Credit or refund the unused portion of the Cash Cost in the event of an event described in paragraph six (6) hereof. Upon request, the Establishment agrees to provide to Transmedia financial statements, all banking records and any other documents which would assist Transmedia in making the aforesaid determination.

An issue of significant dispute between Barber and Kenney was when Kenney divulged the Debtor's bankruptcy filing to Barber. Kenney claimed that he had first mentioned the bankruptcy filing and the Landlord's aggressive actions necessitating the filing of that case to Barber about a week after the filing in April 1996, and mentioned it further to Barber on numerous occasions thereafter. Barber testified that, while he was aware of the Landlord's aggressive posture, he was uncertain of the exact date that he was told about the bankruptcy filing, stating no more than that he became aware of it at some date between June 11, 1996, the Contract date, and October 12, 1996. We find that Kenney did advise Barber of the bankruptcy filing in April 1996, but that this revelation made little impression upon him; that, for this reason, Barber could not recall the date that it was mentioned to him; and that he either forgot it or felt it unnecessary to recite to his supervisors.

The Debtor opened for business on October 12, 1996, almost two months behind a schedule which anticipated an opening prior to the beginning of the school year in late August. Kenney testified that the Debtor planned to have a "soft opening," i.e., forbearance from substantial advertising at the onset, because it needed the Defendants' second advance to finance the necessary marketing.

At the time of the opening, Kenney pressed Barber for immediate payment of the initial $50,000, because he needed same to make payments to the Landlord. At this point, it was necessary that Barber mention the bankruptcy filing to his supervisors, including Paul Ficalora, the Defendants' Executive Vice–President, who also testified at trial.

Ficalora testified at the hearing on January 29, 1997, that, when he learned of the bankruptcy, he wanted no part of the transaction with the Debtor. Barber was informed to so advise Kenney. Kenney vigorously protested the Defendants' attempt to extricate itself from the transaction, indicating his reliance on the Defendants' advance to fund the Debtor's plan. Ultimately, Fica-

lora instructed Barber to offer the Debtor payment of the first $50,000 and no more. Kenney initially accepted this offer under protest, since he desperately needed the first $50,000. However, shortly thereafter, Kenney once again expressed his need for the additional $50,000. The Defendants demanded additional security before agreeing to part with the additional $50,000. Kenney offered security interests in his only other available assets, the Debtor's equipment and Kenney's own interest in a realty partnership from which a successful restaurant operated. He also offered to assist the Defendants in soliciting memberships from the 7,000 employees of the nearby University City Science Center ("UCSC"). In furtherance of these efforts, he introduced Barber to a prominent former UCSC official.

The Defendants ultimately deemed the offered security to be of insufficient liquidity and rejected this offer in early January 1997. Ficalora and Barber also observed that the Debtor's opening had been extremely "soft," noting at the January 29, 1997, hearing, that it had recorded only $73.79 of purchases on the Defendants' cards through January 22, 1997. The Defendants, per Ficalora, thus refused to provide the additional $50,000, triggering the filing of the Proceeding. In the Motion the Debtor sought immediate payment of the second $50,000, and the Complaint additionally sought monetary damages occasioned by the Defendants' alleged breach of the Contract.

Shortly prior to February 7, 1997, the parties executed a stipulation withdrawing the Motion, reciting that the Debtor acknowledged that its settlement with the Landlord had rendered a showing of irreparable harm problematic to it, but also reiterating that the trial of the Proceeding would definitely take place on March 12, 1997. The trial was in fact conducted on that date. Thereafter the parties were accorded until March 28, 1997, to remit post-trial submissions.

The greater part of the March 12, 1997, testimony consisted of Kenney's attempts to prove monetary damages, mostly by describing the frustration of his elaborate projections. Kenney noted that, while profits of $189,121.33 were projected through March

12, 1997, and additional profits of $82,780.32 monthly thereafter, the Debtor had in fact lost approximately $142,000 since its opening. Kenney attributed these unfortunate developments solely to his inability to obtain the second $50,000 loan from the Defendants, over $23,000 of which he claimed was earmarked for marketing expenses.

As an alternative to recovery of the alleged operating losses and lost profits totalling $331,121.33, the Plaintiffs, in their post-trial submissions, sought compensation of the $142,000 operating losses as expenditures allegedly incurred in reliance of the Defendants' making the unfulfilled $50,000 advance. In addition, Kenney personally requested compensation of $5.00 for each employee of the UCSC who was issued a card due to his efforts in introducing Barber, which he claimed was the normal broker's commission for same.

Ficalora made additional efforts at explaining his motivation in deciding that the Defendants would not make the second $50,000 advance at the March 12 trial. As described in the Defendants' post-trial submission, he claimed that the contract provided three alternative grounds for cancellation: (1) refusal to submit financial documentation as required by the contract; (2) one of the "events" described in paragraph 6 of the contract (see page 426 *supra*); or (3) the Defendants' determination, in their sole discretion, that the Debtor would be unable to repay them. De-emphasizing the bankruptcy filing as the determining factor to some degree, Ficalora claimed that his decision was based on the third ground, driven by the Debtor's poor record of sales to the Defendants' cardholders. Although the Debtor claimed to have remitted receipts of about $1,000 for use by the Defendants' cardholders to date, Ficalora claimed to have received no more than the initial $73.79 from cardholders' receipts as of March 12, 1997.

The Defendants alternatively claimed that the contract was unenforceable due to the Debtor's fraud and "unclean hands." In this regard, the Defendants pointed to the alleged failure of Kenney to advise them of the bankruptcy. The allegation that the bankruptcy was not disclosed is the basis of a counter-claim against him. Unfortunately for the Defendants, and fatal to the counterclaim, is our finding that Kenney did advise Barber of the bankruptcy filing shortly after it was initiated. *See* page 427 *supra*. In addition, the Defendants reference an alleged mistaken description of the Defendants' loan program in the Debtor's disclosure statement, which was not supplied to Barber until after confirmation, as evidence of fraud.

The Defendants also argued that the Debtor's projections were too speculative to support an award of damages based on their differences from the Debtor's actual losses. They noted that, while they have pursued UCSC employees as cardholders, Kenney's contacts were not instrumental to these efforts, and that in fact no formal contract with the UCSC had been executed.

Since both parties tended to refer to the Defendants interchangeably throughout their briefs, they contended that the Plaintiffs had not supported a claim that the Network intentionally interfered with the contract between the Debtor and the Restaurant Co. Indeed, the Defendants correctly pointed out that the Restaurant Co. was the only party to the Contract and that no claims against the Network had been proven.

## C. DISCUSSION

The issue of the Defendants' liability to the Plaintiffs involves an issue of interpretation of the Contract, particularly paragraphs 6 and 7 thereof, quoted at page 426 *supra*. We note that the Contract, at ¶ 10, makes reference to Pennsylvania law and involved the operation of a Pennsylvania business, and therefore the dispute appears to be governed by applicable Pennsylvania law. The parties appear to agree that the Proceeding must be decided under Pennsylvania law.

■ We start from our observation that the Contract was provided to the Debtor by the Restaurant Co. without any apparent negotiation over its form. Therefore, it must be interpreted subject to the principle that "[a]ny ambiguity resulting from [the] ... choice of language will be interpreted most strongly against the party who wrote it," in this case the Restaurant Co. *In re F.H.*

*McGraw & Co.*, 473 F.2d 465, 468 (3d Cir. 1973). *See also Kiewit Eastern Co. v. L & R Construction Co.*, 44 F.3d 1194, 1202–03 (3d Cir.1995); *In re Barrett*, 136 B.R. 387, 392 (Bankr.E.D.Pa.1992); *In re United Nesco Container Corp.*, 68 B.R. 970, 974 (Bankr. E.D.Pa.1987); *Hutchison v. Sunbeam Coal Corp.*, 513 Pa. 192, 202 n. 5, 519 A.2d 385, 390 n. 5 (1986); and *Raiken v. Mellon*, 399 Pa.Super. 192, 198, 582 A.2d 11, 13 (1990).

▉ Ficalora argued that paragraph 7 of the Contract allowed the Defendants to refuse to make the final $50,000 advance. Paragraph 7 does provide that the Defendants can refuse to make payments under the Contract, but only if (1) the Debtor failed to provide necessary financial documentation to the Defendants; or (2) if it determined that the Debtor would be unable to repay the Defendants "in the event of an event described in paragraph six (6) hereof."

There is no serious allegation of any failure of the Debtor to provide necessary financial data. The Debtor's pre-contractual projections were the only advances of financial data, and they were admittedly elaborate. No evidence of any request for any other information was presented. The Defendants did not convincingly establish, and ultimately mostly abandoned the pursuit of arguing that one of the "events" set forth in paragraph 6 justifying avoidance of the obligation to make all of the payments due under the Contract had occurred.

The only paragraph 6 "event" seriously alleged by the Defendants to have been present was "(2) the sale, closing, *bankruptcy* or interruption" (emphasis added) of the Debtor's business. It is of course true that the Debtor is now in bankruptcy. However, the Debtor was also in bankruptcy at the time that the Contract was executed, and we found that Kenney so informed Barber of this fact from the outset. We therefore conclude that the fact that the Debtor had filed bankruptcy could not have been deemed as an event which the Defendants believed would render the Debtor unable to refund the advances paid to it.

Furthermore, juxtaposed as it is between a potential sale, closing, or interruption of the contracting establishment's business, and considering that the ambiguous reference in the Contract to a bankruptcy filing must be construed against the Defendants, we find that the "bankruptcy" reference in paragraph 6 is a bankruptcy "event" which would take place after the Contract was executed and would indicate a downward slide of the business. It would not appear to contemplate that a known bankruptcy filing before the Contract is signed, in which, as here, the Defendants' advances are contemplated as the means by which the business establishment can emerge from bankruptcy, could serve as the Defendants' basis to refuse to perform.

Finally, at the time that the Defendants made the initial $50,000 advance, they admittedly were aware of the Debtor's bankruptcy. At that time, of course, the bankruptcy had nearly proceeded to confirmation and was therefore in a state of anticlimax. Future developments in this bankruptcy case at that point could not logically be viewed as events suggesting that the Debtor would be unable to render performance to the Defendants in the future.

▉ The Defendants have rested their legal defense on the presence of a purported third alternative contractual ground for cancellation, *i.e.*, a determination, in their sole discretion, that the Debtor would be unable to make repayment, not related to the events enumerated in paragraph 6. However, as we explained at page 429 *supra* and stated to the Defendants in a colloquy at the conclusion of the March 12, 1997, trial, no such ground is recited in the Contract. The determination that the establishment cannot pay must be made, per paragraph 7 of the Contract, "in the event of an event described in paragraph (6) hereof."

Our reading of the Contract follows quite clearly from its language. To the extent that any ambiguity exists, the construction of the Contract against the drafting party further supports our interpretation.

Furthermore, the interpretation proffered by the Defendants is nonsensical. It would provide the Defendants with an unfettered right to avoid any of its loan contract on its unilateral conclusion that its prospects of re-

payment were jeopardized. This broad ground would swallow up any commitment on the part of the Defendants. Its breadth would stand in sharp contrast to the other grounds, which require a failure of the establishment to honor its commitment to submit documentation or the occurrence of the distinct "events" set forth in paragraph 6 of the Contract to allow the contract to be terminated.

In addition, the Defendants offered no comprehensible factual bases for their action. The initial $50,000 advance was made despite the Defendants' then-admitted knowledge of the Debtor's bankruptcy, which Ficalora, at the January 29, 1997, hearing described as the main reason why the further advance was not made. At the trial on March 12, 1997, Ficalora emphasized the Debtor's prior economic performance as the primary basis for his action. However, the second payment was due just thirty (30) days after the opening of the restaurant, on November 11, 1996. It seems unlikely that the Defendants could have reasonably expected the Debtor to have established an impressive economic performance within a month of its opening. Rather, it appears that the ever-changing reasons articulated by Ficalora for his actions were pretextual, and that the Defendants' actions were in fact attributable to a comprehensive tightening in its credit policies, as the Plaintiffs suggested.

■ For all of the foregoing reasons, we conclude that the Debtor's bankruptcy cannot be deemed an event which would allow the Defendants to refuse to perform, pursuant to paragraphs 6 and 7 of the Contract. The attempts of Ficalora to attribute this event to the bankruptcy filing, and the other explanations for his actions, lack logic and credibility and are therefore rejected. Thus, we conclude that the Defendants, or at least the Restaurant Co., is bound to make the remaining $50,000 advance to the Debtor which is due under the terms of the Contract.

The subsequent negotiations between the parties did not diminish the Debtor's rights, in light of several pertinent legal principles. In addition to our refusal to find an express agreement to any revisions of the Contract terms by the Debtor, we find that any attempted modifications of the Contract are unenforceable because they lacked consideration.

■ First, the Defendants claim that they paid the initial $50,000 only in consideration of Kenney's agreement that the Debtor would waive its right to the remaining $50,000. However, "[i]t is axiomatic that the performance of an act which one party is legally bound to render to the other party is not legal consideration." *Chatham Communications Inc. v. General Press Corp.*, 463 Pa. 292, 297, 344 A.2d 837, 840 (1975). Thus,

> a promise to carry out a contract subsisting between the parties, or the performance of such a contractual duty, is not a consideration which will support a contract. It is only when the legal duty is doubtful or the subject of honest and reasonable dispute that a promise to perform it may serve as consideration for a new contractual obligation ...

*Warren Tank Car Co. v. Dodson*, 330 Pa. 281, 285, 199 A. 139, 141 (1938). *See also Lombardo v. Gasparini Excavating Co.*, 385 Pa. 388, 391, 123 A.2d 663, 668 (1956).

The Restaurant Co. had a legal obligation to make two $50,000 advances to the Debtor under the terms of the Contract. The Defendants' agreement to make the initial advance in exchange for an agreement of the Debtor to waive its right to the second $50,000 therefore lacked consideration and is for that reason unenforceable. The Defendants' obligation to advance the second $50,000 consequently remained intact at all times after June 11, 1996.

■ Second, the parties entered into negotiations whereby the Defendants would acknowledge a contractual duty to advance the second $50,000 only if the Debtor offered the Defendants an "enhancement" of security. There is little doubt that Kenney, desperate for the cash, was willing to provide security, and that such a modification of the Contract terms did not occur only because the Defendants refused to accept the security offered.

The legal principle applicable to this set of circumstances was thusly articulated by us in *In re Griffin*, 1995 WL 495998, at *2 (Bankr.

E.D.Pa. August 15, 1995), quoting *Nicolella v. Palmer,* 432 Pa. 502, 509, 248 A.2d 20, 23–24 (1968):

> "[t]he general rule is stated in 17 C.J.S. Contracts p. 830, § 112a [(1963)]: 'The promise of a person to carry out a subsisting contract with the promises or the performance of such a contractual duty is clearly no consideration, as he is doing no more than he was already obliged to do, and hence has sustained no detriment, nor has the other party to the contract obtained any benefit. Thus, a promise to pay additional compensation for the performance by the promisee of a contract which the promisee is already under obligation to the promisor to perform is without consideration, and this rule has been applied to building and construction contracts.' [Footnotes omitted]. The rule was applied in *Quarture v. Allegheny Co.,* 141 Pa.Super. 356, 14 A.2d 575 (1940), which, quoting from the leading case of *Lingenfelder v. Wainwright Brewing Co.,* 103 Mo. 578, 15 S.W. 844 (1891), indicated that the rule has a very valid purpose in preventing a promisee from taking advantage of the promisor's necessities and extorting a better price." *Accord, Argeros & Co. v. Commonwealth Dep't of Transp.,* 67 Pa. Cmwlth. 531, 535–36, 447 A.2d 1065, 1068 (1982); and *Commonwealth Dep't of Transp. v. Mitchell's Structural Steel Painting Co.,* 18 Pa.Cmwlth. 591, 597, 336 A.2d 913, 917 (1975).

Hence, we conclude that the Defendants did not provide any consideration to the Debtor in exchange for Kenney's promises to provide additional security to the Defendants to make the second $50,000 advance. As a result, these supplementary promises of the Plaintiffs are likewise unenforceable for lack of consideration.

■ The foregoing analyses allow us to conclude that the Defendants, or at least the Restaurant Co., is liable to the Plaintiffs for breach of contract. The difficulty remaining is determining what damages have been proven and what remedies are therefore appropriate to be provided to the Plaintiffs.

The Defendants cite *Geisinger Clinic v. Di Cuccio,* 414 Pa.Super. 85, 108–09, 606 A.2d 509, 521–22 (1992), *appeal denied,* 536 Pa. 625, 637 A.2d 285 (1993), *cert. denied,* 513 U.S. 1112, 115 S.Ct. 904, 130 L.Ed.2d 788 (1995), for the principles that requiring the Defendants to remit the $50,000 loan balance is a decree of specific performance, an equitable remedy which requires "clean hands" on the part of the Plaintiffs. While we agree with these principles, we find no "unclean hands" of the Plaintiffs foreclosing such a remedy. We have already stated that we disbelieve the Defendants' assertion that Kenney concealed the Debtor's bankruptcy filing from Barber or his principals, the Defendants. We also conclude that there is no support for the Defendants' alternative claim that the description of the Contract in the Debtor's disclosure statement or the failure to promptly supply the Defendants with a copy of the disclosure statement were fraudulent acts. The Defendants were not creditors of the Debtors entitled to vote on its plan and there was hence no reason to provide them with a copy of the disclosure statement at any time. Although the description of the Contract in the disclosure statement could give a reader the misimpression that no repayment of any kind was required in consideration for the Defendants' advances, it is difficult to see how the statement that no monetary payment is required and that the consideration is by way of discounts on customers' bills is grossly inaccurate. Nor are any alleged failures to describe the Transmedia Credit in more detail alleged to be in any way material to the plan or its confirmation.

Therefore, we find no fraud on the part of the Plaintiffs. The equitable relief of enforcing specific preference of the loan Contract is therefore quite appropriate. We also find that; since the credit at issue was not available from other sources, *see* 3 RESTATEMENT (SECOND) OF CONTRACTS ("the Restatements"), § 351, comment *e,* at 140 (1981), a decree requiring specific performance, as in *Geisinger Clinic,* 414 Pa.Super. at 108–09, 606 A.2d at 521–11, is appropriate. We will therefore order that the contracted loan from the Restaurant Co. to the Debtor be promptly made.

Some further damages, to compensate the Debtor for monetary losses occurring as a result of the Defendants' breach of the Contract and to assure a prompt performance at this juncture, appear appropriate. *See* Restatement, *supra,* § 351, comment *e,* Illus. 14, at 140–41. However, as we recently observed in *In re Pennsylvania Footwear Corp.,* 204 B.R. 165, 168 (Bankr.E.D.Pa. 1997):

> In order to recover in a breach of contract action, the plaintiff has the burden of proving that the defendant's actions were the proximate cause of the plaintiff's injury and that the injury caused by the defendant's actions was foreseeable. *See In re 222 Liberty Associates,* 101 B.R. 856, 863 (Bankr.E.D.Pa.1989); and *In re Direct Satellite Communications, Inc.,* 96 B.R. 507, 515–516 (Bankr.E.D.Pa.1989). The RESTATEMENT OF CONTRACTS, § 330, at 509 (1932), states that,
>
>> "[i]n awarding damages, compensation is given for only those injuries that the defendant had reason to foresee as a probable result of his breach when the contract was made. If the injury is one that follows the breach in the usual course of events, there is sufficient reason for the defendant to foresee it; otherwise, it must be shown specifically that the defendant had reason to know the facts and to foresee the injury."
>
> *See also* 2d Restatement [of Contracts, *supra* ] § 351, at 135–36. After these elements are shown, the plaintiff is required to prove the amount of damages by proper evidence with "reasonable certainty," and the court may itself compute damages which are to be appropriately awarded when damages are established. *222 Liberty Associates, supra,* 101 B.R. at 863.

The Plaintiffs ask us to measure damages by comparing the Debtor's financial projections of profits supplied to the Defendants in 1995 with the Debtor's weak economic performance. They ask us to conclude that the Defendants' failure to advance the remaining $50,000 was the proximate cause of the Debtor's poor performance and that these adverse results were foreseeable consequences of their failure to provide the $50,000 loan balance to the Defendants.

In *National Controls Corp. v. National Semiconductor Corp.,* 833 F.2d 491, 495–96 (3d Cir.1987), the court states that

> [e]ven where the plaintiff's claim truly represents a claim for lost profits, rather than loss of good will, it may be rejected as speculative and unrecoverable. This is particularly true where the claim of lost profits is made in the context of a new and untried business venture. *Delahanty v. First Pennsylvania Bank, N.A.,* 318 Pa.Super. 90, 117–26, 464 A.2d 1243, 1257–61 (1983) (burden of proof is high with respect to new business profits).

*Accord, Advent Systems Ltd. v. Unisys Corp.,* 925 F.2d 670, 680–81 (3d Cir.1991); *In re Joseph B. Dahlkemper Co.,* 165 B.R. 149, 156–57 (Bankr.W.D.Pa.1994); *Exton Drive-In v. Home Indemnity Co.,* 436 Pa. 480, 488–89, 261 A.2d 319, 324–25 (1969), *cert. denied,* 400 U.S. 819, 91 S.Ct. 36, 27 L.Ed.2d 46 (1970); and *Pollock v. Morelli,* 245 Pa.Super. 388, 397–98, 369 A.2d 458, 463 (1976).

It is true that, unlike certain other jurisdictions, Pennsylvania has not closed the door entirely on a plaintiff's recovery of lost profits by new businesses. *See United Artists Theatre Circuit, Inc. v. Monarch, Inc.,* 1996 WL 711483, at *6 (E.D.Pa. Dec. 9, 1996); *Tristar Cosmetics, Ltd. v. Westinghouse Broadcasting Co.,* 1992 WL 57771, at *2 (E.D.Pa. March 18, 1992); *Blackwood Coal Co. v. Deister Concentrator Co.,* 626 F.Supp. 727, 731–32 (E.D.Pa.1985); *Warren v. Greenfield,* 407 Pa.Super. 600, 612, 595 A.2d 1308, 1314 (1991); and *Merion Spring Co. v. Muelles Hnos. Garcia Torres, S.A.,* 315 Pa.Super. 469, 486–92, 462 A.2d 686, 695–97 (1983). However, these cases, as well as *National Controls, supra,* and others point out, such damages must be proven with "reasonable certainty" and with more persuasive evidence than is required in the case of ongoing business. *See also Gen. Dynafab, Inc. v. Chelsea Industries, Inc.,* 301 Pa.Super. 261, 265–66, 447 A.2d 958, 960 (1982); and Restatement, *supra,* § 352, comment *a,* Illus. 2, at 145–46.

We are unable to accept the Plaintiffs' contention that they have persuasively prov-

en such damages with the requisite "reasonable certainty" for several reasons. First, Kenney admitted that his projections related not to the very first months of the business, but a period after the business had stabilized approximately four months after its initially-planned "soft" opening. Second, the projections presumed an ideally-timed late August opening of the restaurant, concurrently with the commencement of the school term at Penn. The restaurant was not opened until October 12, 1996, after the fall semester began, for reasons which did not implicate the Defendants, because the Restaurant Co.'s first advance was not due until the restaurant had opened. The optimal time for opening, relied upon in the projections, had therefore passed, throwing off the accuracy of the projections. The restaurant was only open for about six weeks, rather than the projected three months, before the November, December, and January school holidays arrived. The timing on which the projections were based was therefore frustrated and they were for that reason no longer reliable.

Third, it is not clear that Kenney could not have utilized other financial resources for marketing, and that his own decisions regarding resource-allocation played a significant role in frustrating the projections. Kenney claimed that rent and payroll were important obligations which had to be paid with his other funds. However, we are not convinced that the payroll could not have been reduced until the necessary marketing took place. This factor also relates to the foreseeability of the damages claimed to the Defendants. It appears unrealistic to insist that the Defendants should have foreseen that their failure to advance the relatively small sum of $50,000 could have destroyed the Debtor's entire marketing plan. If it did, we are not convinced that Kenney is not to be faulted for a failure to improvise his plans when all of the anticipated funds were not forthcoming.

Fourth, Kenney's prospect of a settlement of the controversy by offering security and other compensation and negotiating with the Defendants in this vein through to January 1997 suggests that the timing of the $50,000 advance was not as critical as Kenney would now have us conclude. It appears that Kenney did not foresee the consequences of the Defendants' failure to make the additional $50,000 advance until January. This sequence of events suggests that Kenney either did not perceive the connection between his loss of profits and the Defendants' failure to fund the $50,000 at an earlier stage or he is exaggerating this effect now. We suspect, given Kenney's apparent astute business sense, that exaggeration of the damages is the more likely of the alternatives to be true.

Finally, we find the projection of the instant restaurant's profits much more difficult to gauge than those in the few cases decided under Pennsylvania law where future profits of a new business were permitted as an element of damages, i.e., United Artists, supra, 1996 WL 711483, at *6; Warren, supra, 407 Pa.Super. at 612–13, 595 A.2d at 1314–15; and Merion Spring, supra, 315 Pa.Super. at 489–91, 462 A.2d at 697–98. For example, the figures produced in Merion Spring were found to be conservative and, although the industry was new to the Mexican community where it was to be established, it was an industry which was apparently not crowded with competitors, and in which it was fairly easy to estimate the profits. 315 Pa.Super. at 489–90, 462 A.2d at 697. In such a setting, a prognosis would appear relative easy to advance. At that, the court only awarded $200,000 of $325,000 profits claimed to have been lost. Id., 315 Pa.Super. at 489–90, 462 A.2d at 697. United Artists involved a theatre, the profits of which were measured against another theatre in a suburban setting. 1996 WL 711483, at *6. Warren involved a business which previously existed, but claimed a contractual breach, and measured damages, of a failure to allow it to expand. 407 Pa.Super. at 604–06, 612, 595 A.2d at 1311, 1314.

By way of contrast, the Debtor was an entirely new business. The competition of restaurants in Philadelphia and even in the immediate area of Penn is tremendous. Many restaurants exist with many different levels of success, due to variables which appear to us impossible to capture on projections. Prognosis of profits in this setting appears much more difficult than in the limit-

ed competitive climate of the automobile spring industry in Mexico at issue in *Merion Spring*, the predictability of theatre profits in *United Artists*, or the measurement of losses from a frustrated expansion, as in *Warren*.

We therefore refuse to measure the Plaintiffs' damages by reference to Kenney's projections of profits, and the comparison of this figure to the Debtor's actual substantial losses.

■ We also decline to accept the Plaintiffs' alternative measurements of consequential damages. We acknowledge the concept that, if lost profit cannot be proven (or if the contract would result in losses), the injured party may recover, an element of damages, expenditures not transferable to other endeavors and made in reliance upon a contract. *See* Restatement, *supra*, § 349, at 124–26. However, reimbursement of expenditures attributable solely to the anticipated advances by the Defendants are not what the Plaintiffs are seeking in this contention. Rather, they seem to be arguing that, since keeping the restaurant open reduced the Defendants' damages from those which would have arisen had the restaurant closed, their expenses of keeping the restaurant open, *i.e.*, their losses of $142,000, should be reimbursed by the Defendants. We reject this argument because it is apparent that Kenney kept the restaurant open for reasons other than to mitigate these damages. Rather, it appears that he believed that he could run the restaurant profitably during this period, although not as profitably as he could without the Defendants' final $50,000 advance.

■ Finally, there is no basis on which to justify ordering compensation to be paid to Kenney for his efforts to obtain cardholders for the Defendants from UCSC employees. There is no evidence indicating how many or that any UCSC employees became the Defendants' cardholders, not to mention proof that any such customers were the result of Kenney's efforts. There was no contract on the part of the Defendants, explicit or implicit, to compensate Kenney for these efforts. The fact that Kenney voluntarily and gratuitously performed these services in the hope that they would encourage the Defendants to honor their Contract obligations does not provide Kenney with a basis of a claim for compensation for such services.

■ Despite our rejection of the various methods of measurements of consequential damages proposed by the Plaintiffs, we conclude, as we did in *Pennsylvania Footwear*, 204 B.R. at 182–83, that some more modest measure of damages is appropriate. We do not doubt that the Defendants' stubborn and unjustified refusal to provide the $50,000 fund balance to the Debtor resulted in some damages to the Plaintiffs. The Defendants should not be able to ignore their contractual undertaking, of which time was of the essence, for several months and, when finally ordered to perform, walk away with only the duty to do that to which they were contractually committed all along.

In *Pennsylvania Footwear*, in making the defendant pay only $3,500 out of their pocket, *see id.*, we selected a milder remedy than making the defendant pay the plaintiff a substantial monetary payment, but one which provided significant practical benefit to the plaintiffs. We will attempt to impose a similar penalty on the instant Defendants. We will order that half of the Defendants' compensation for the second $50,000 advance be waived. Therefore, although we will order the Restaurant Co. to advance the additional $50,000 balance, as required by the Contract, we will require the Debtor to repay the Defendants only $50,000 on this advance and $150,000 in total, as opposed to the $200,000 amount of Transmedia Credit normally collectible in consideration for the Defendants' advances totalling $100,000.

We also acknowledge that imminent receipt of the $50,000 loan balance is important to the Debtor and that an incentive should be built into our order to assure a prompt payment. We will therefore order that the $50,000 loan balance be remitted by April 10, 1997, or another $5,000 will be deducted from the $150,000 repayment obligation, and an additional $5,000 will be deducted for each week thereafter in which a remittance is not made.

### D. CONCLUSION

For the foregoing reasons, an order providing for the aforesaid remedies will accord-

ingly be entered in resolution of the Proceeding.